**In re PAYROLL EXPRESS
CORPORATION, et al.,
Debtors.**

**John S. PEREIRA, Esq., as Chapter 11
Trustee of the Estate of Payroll Express Corporation, et al., Plaintiff,**

**v.**

**AETNA CASUALTY & SURETY COMPANY, Federal Insurance Company, Chubb Group of Insurance Companies, and Angus John Roberts, an Underwriter at Lloyd's, London, on behalf of himself and all those other Lloyd's Underwriters subscribing to Insurance Policy Nos. C92163400F and C92163500F, et al., Defendants.**

No. 95 Civ. 4385(SAS).

United States District Court,
S.D. New York.

Oct. 1, 1997.

Robert M. Horkovich, Adam Reeves, Peter J. Andrews, Catherine M. Flanders, Anderson, Kill & Olick, P.C., New York City, NY, for plaintiff.

James M. McCullough, III, Jeffrey M. Winn, Sedgwick, Detert, Moran & Arnold, New York City, NY, for defendant LEU.

Arthur N. Lambert, Alan M. Goldberg, Lambert, Weiss & Pisano, New York City, NY, for defendant Aetna.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

### I. Introduction

This insurance coverage dispute arises from a non-core adversary proceeding originally commenced before the United States Bankruptcy Court for the Southern District of New York on May 1, 1995. Plaintiff John S. Pereira is the Chapter 11 Trustee of the estate of Payroll Express Corporation and Payroll Express Corporation of New York (collectively, "PEC"). He seeks to recover as property of the PEC estate the proceeds of various employee dishonesty and crime insurance policies issued by defendants, and to recover damages resulting from defendants' alleged bad faith denial of coverage under those policies. Defendants Aetna Casualty & Surety Company ("Aetna") and the London Excess Underwriters ("LEU")[1] now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and plaintiff cross-moves for summary judgment against LEU. For the reasons that follow, LEU's motion is granted, plaintiff's cross-motion is denied, and Aetna's motion is partially granted.

### II. Applicable Legal Standard

A party is entitled to summary judgment when there is "no genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of demonstrating the absence of a material factual dispute rests on the moving party. *See Gallo v. Prudential Residential Svcs., Ltd.*, 22 F.3d 1219, 1223 (2d Cir.1994). Once that burden is met, the non-moving party must present "significant probative supporting evidence" that a factual dispute exists. Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11.

The court's role is not to try issues of fact, but rather to determine whether issues exist to be tried. *See Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir. 1989); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987). All ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *See Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14; *Donahue*, 834 F.2d at 57, 60. If there is any evidence in the record from which a reasonable inference could be drawn in favor

---

**1.** Although these defendants were listed in the caption as "Angus John Roberts, an Underwriter at Lloyd's, London, on behalf of himself and all those other Lloyd's Underwriters subscribing to Insurance Policy Nos. C92163400F and C92163500F, et al.", I have referred to them throughout the course of this litigation as the "London Excess Underwriters" or "LEU". *See, e.g., In re Payroll Express Corp.*, No. 95 Civ. 4385, 1996 WL 706941, at *1 (S.D.N.Y. Dec. 9, 1996).

of the non-moving party on a material issue of fact, summary judgment is improper. *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

## III. Background

### A. Factual Background and Plaintiff's Allegations

Set forth below are the undisputed facts of this case and those alleged (but not yet proven) by plaintiff. These undisputed facts and factual allegations are drawn from the parties' "Statements of Material Facts Not in Dispute" submitted pursuant to Local Civil Rule 56.1 and from the plaintiff's Conformed Amended Complaint (the "Amended Complaint"), and will serve to place the legal issues raised by the parties' motions in context.[2]

—The Parties—

■ Payroll Express Corporation is a New Jersey corporation which formerly maintained a principal place of business at 1257–1265 Durant Street, Elizabeth, New Jersey. *See* Amended Complaint at ¶ 7; LEU 56.1 Statement at ¶ 1.

■ Payroll Express Corporation of New York is a related New York corporation which formerly maintained a place of business at 500 Cherry Lane, Floral Park, New York. *See* Amended Complaint at ¶ 8.

■ Aetna is a Connecticut corporation. *See id.* at ¶ 18.

■ Angus John Roberts ("Roberts") is a British subject who resides in England. Roberts is an underwriter at Lloyd's of London, and is the leading underwriter on the insurance policies that are the subject of this action. *See* LEU 56.1 Statement at ¶ 2.

—The Business of PEC & the Roles of its Principals & Employees—

■ Robert M. Felzenberg ("Robert Felzenberg") is the founder, president and chief executive officer of PEC. Robert Felzen-

berg also owns half of PEC's common stock. *See* Aetna's 56.1 Statement at ¶ 16.

■ Barbara Felzenberg is the wife of Robert Felzenberg, and owns the remaining half of PEC's common stock. *See id.*

■ George Gillmore ("Gillmore") is a partner in the New Jersey accounting firm of Gillmore, Gillmore & Graham. Between 1972 and 1992, Gillmore and his firm provided professional accounting services to PEC. *See id.* at ¶ 30. Howard Messer ("Messer") is a certified public accountant who had been employed by Samuel Klein & Co. and who subsequently maintained his own accounting firm. *See id.* at ¶ 36.

■ PEC operated a payroll check cashing service from approximately 1967 through May, 1992. During this time, its customers included both private and public employers in New York and New Jersey. *See* Amended Complaint ¶¶ 35–36.

■ In the general course of business, PEC entered into agreements with its customers whereby, in advance of the customers' paydays, those customers would transfer funds into PEC bank accounts including those at Chase Manhattan Bank, United Jersey Bank, and National Westminister Bank ("NatWest" New Jersey). These funds were commingled with deposits of other customers and were used by PEC to handle the on-site distribution of cash in exchange for the endorsed payroll checks of the customers' employees. *See id.* at ¶ 37. *See generally Payroll Express Corp. v. The Aetna Casualty & Surety Co.*, 659 F.2d 285, 287 (2d Cir.1981) (describing business of PEC).

■ After funds were transferred from customers to PEC accounts, PEC withdrew cash from its accounts and packaged those cash funds at its offices in preparation for on-site distribution. On the pay-days, PEC employees transported the cash funds to its customers' work sites, where they were distributed in exchange for endorsed payroll checks. *See* Amended Complaint at ¶ 38.

---

**2.** Citations to the parties' Statements of Undisputed Facts submitted pursuant to Local Civil Rule 56.1 are to those statements of a party that are not disputed by the opposing party. Citations to the plaintiff's Amended Complaint follow allegations of facts not agreed upon in the 56.1 Statements (and thus which may be disputed), but which form the background of plaintiff's claims.

PEC was required to return the endorsed payroll checks to each customer by depositing those checks directly into specific accounts designated by the customers. *See id.* at ¶ 39.

PEC was also required to return to each customer any funds intended to be used to cash employee payroll checks that were not actually used to cash such checks (the "unused funds"). *See id.* at ¶ 40.

—The Alleged Defalcations
of PEC Employees—

As early as the mid–1980's, Robert Felzenberg and Barbara Felzenberg began to divert PEC funds for their own benefit and to at least four other companies they controlled. *See* Aetna's 56.1 Statement at ¶ 46.

These funds were used, *inter alia,* to fund the Felzenberg-controlled companies, to acquire various securities, to purchase jewelry and other personal items for the Felzenbergs' personal enjoyment, and to cover PEC's cash flow needs. *See id.* at ¶¶ 46, 48–50.

Plaintiff alleges that in the fiscal years 1990, 1991 and 1992, PEC suffered approximately $3.5 million each year in operating losses in addition to, and as a result of, these conversions. Plaintiff further alleges that in the fiscal years 1988 and 1989, PEC suffered approximately $2 million each year in operating losses in addition to, and as a result of, these conversions. *See* Amended Complaint ¶¶ 123–24.

Plaintiff alleges that, prior to July, 1991, one of the ways funds were diverted from PEC was by failing to return unused funds in a timely manner. Rather, plaintiff claims, these funds were transferred from PEC with no intention of returning them. *See id.* at ¶¶ 129–130.

To perpetuate this conduct, Robert Felzenberg, Gillmore and other PEC employees (the "defalcating employees") began inflating the account balances at the United Jersey Bank and NatWest New Jersey through a check-kiting scheme. Plaintiff claims this scheme was effected by the defalcating employees by depositing into a PEC account at one bank worthless checks drawn on a PEC account from the other bank. *See* Aetna's 56.1 Statement at ¶ 50.

Plaintiff alleges that to reduce the likelihood of detection by the two banks, the defalcating employees drew and deposited numerous checks for small amounts each day, rather than one check for a large amount. At the height of the scheme, plaintiff claims, the defalcating employees deposited over $20 million of worthless checks into the PEC accounts at both banks. *See* Amended Complaint at ¶¶ 140–142.

Plaintiff alleges that during the period of the check-kiting scheme, the monthly bank service fees charged to PEC by the banks increased from approximately $20,000 per month to approximately $100,000 per month. *See id.* at ¶ 143.

Plaintiff alleges that Robert Felzenberg provided the banks with fraudulent financial statements to conceal the check-kiting scheme. Plaintiff also claims that these financial statements were prepared by Gillmore and audited by Messer. *See id .* at ¶¶ 148–150.

Plaintiff alleges that the fraudulent financial statements falsely represented PEC's financial condition, and concealed the fact that its liabilities greatly outweighed its realizable assets. *See id.* at ¶ 54 ("By the close of business on June 5, 1992, Payroll Express had liabilities of approximately $36.2 million and assets of approximately $3.0 million"); *see also id.* at ¶ 151.

Plaintiff alleges that, in addition to Robert Felzenberg and Barbara Felzenberg, Gillmore directly assisted in the systematic theft of PEC and received approximately $1.5 million in loans that were never repaid, and that Gillmore used to purchase, *inter alia,* stock and real estate for his personal use. *See id.* at ¶¶ 189–91.

Plaintiff alleges that Howard Messer received at least $28,000 directly from PEC and $87,500 from a Felzenberg-controlled company. *See id.* at ¶¶ 192–93.

Plaintiff also alleges that Robert Gussow, Rose Felzenberg, Emily Felzenberg,

and Alicia Felzenberg[3] also participated in, and benefited from, the on-going scheme to mulct PEC. *See id.* at ¶¶ 48, 194–199.

—The Aetna Policy—

■ On or about February 19, 1976, Aetna issued to Payroll Express Corporation a Comprehensive Dishonesty, Disappearance and Destruction Policy (the "Aetna Policy"). This policy was issued out of Aetna's Albany, New York office and delivered to the Poughkeepsie, New York office of Marshall and Sterling ("M & S"). Payroll Express Corporation of New York was added to the policy effective June 22, 1988. *See* Aetna's 56.1 Statement at ¶ 2.

■ The Preamble and Insuring Agreement I of the Aetna Policy provided in pertinent part:

> **The Company,** in consideration of the payment of the premium, and subject to the Declarations made a part hereof, the General Agreement, Conditions and Limitations and other terms of this Policy, **agrees with the Insured ... to pay the Insured for:.... Loss of Money, Securities, and other property which the Insured shall sustain,** to an amount not exceeding in the aggregate the amount stated in the Table of *Limits of Liability* ... **through any fraudulent or dishonest acts or acts committed by any of the Employees, acting alone or in collusion with others.**

*Id.* at ¶ 4 (emphasis added).

■ Section 3 of the Conditions and Limitations portion of the Aetna Policy defines employees as follows:

> Section 3. The following terms, as used in this Policy; shall have the respective meanings stated in this Section: .... **"Employee" means any natural person** (except a director or trustee of the Insured, if a corporation, who is not also an officer or employee thereof in some capacity) **while in the regular service of the Insured** in the ordinary course of the Insured's business during the Policy Period and **whom the Insured compensates by salary, wages or commissions and has**

**the right to govern and direct in the performance of such service,** and does not mean any broker, factor, commission, merchant, consignee, contractor or other agent or representative of the same general character.

*Id.* at ¶ 6 (emphasis added).

■ Endorsement 28 of the Aetna Policy provides that Robert Felzenberg was not an employee within the meaning of that term as defined by Section 3 and used throughout the policy. *Id.* at ¶ 7.

■ Section 2 of the Exclusions portion of the Aetna Policy provides in pertinent part:

> This Policy does not apply: (a) to loss due to any fraudulent, dishonest or criminal act by any Insured or a partner therein, whether acting alone or in collusion with others[.]

*Id.* at ¶ 11.

—The LEU Policies—

■ LEU issued three insurance policies (the LEU Primary Policy, First LEU Excess Policy, and the Second LEU Excess Policy) (collectively, the "LEU Policies") to PEC effective February 7, 1992 for a 12 month period. *See* LEU 56.1 Statement at ¶¶ 3–5.

■ The LEU Primary Policy and the First LEU Excess Policy provided coverage for "Employee Theft, Premises Loss and Transit Loss". The Second LEU Excess Policy provided for "Employee Theft occurring at 1257–Durant Street, Elizabeth, New Jersey and 500 Cherry Lane, Floral Park, New York; and Premises Coverage and those same two locations." *Id.*

■ The application form for the LEU Policies was submitted by PEC on January 16, 1992 and signed by Robert Felzenberg as PEC's president. *See id.* at ¶ 13.

■ The line immediately above Robert Felzenberg's signature on the application form stated in pertinent part:

> I/WE HEREBY DECLARE THAT THE ABOVE STATEMENTS, PARTICULARS AND ANSWERS ARE TRUE

---

3. Each of these individuals is alleged to have been an employee of PEC. *See* Amended Complaint at ¶¶ 89–102.

AND THAT I/WE HAVE NOT SUP-PRESSED OR MISSTATED ANY MATERIAL FACTS.... IT IS FURTHER AGREED THAT THE CONTINUED ACCURACY OF THE STATEMENTS, PARTICULARS AND ANSWERS SHALL BE A CONDITION PRECEDENT TO THE UNDERWRITERS' LIABILITY UNDER THE PROPOSED INSURANCES....

*Id.* at ¶ 15.

■ Question number 10 of the application by PEC to LEU stated: "Has [PEC] suffered a loss during the past five years? If 'Yes,' give brief details and amount involved". *Id.* at ¶ 16.

■ In response to question number 10, PEC provided the following information: "YES: Security system for premises and vault was breached during non-operating hours. Burglary amount was $1,500,000. Occurred on 5/19/88 at our Cherry Lane, Floral Park location". *Id.* at ¶ 17.

■ Question number 36 of the application form stated: "Is there any other information which is or may become material to the proposed insurance and which is not already disclosed to Underwriters?" *Id.* at ¶ 24.

■ In response, PEC answered "NONE". *Id.* at ¶ 25.

■ The LEU primary policy states in pertinent part:

Underwriters hereon shall be liable for direct losses of Money, Securities and other property caused by Theft or forgery by an identifiable Employee(s) of any Insured acting alone or in collusion with others.

Plaintiff's 56.1 Statement at ¶ 12.

■ The LEU primary policy defines "employee" as follows:

**Employee or Employees means,** respectively, **one or more persons while in the regular service of any Insured in the ordinary course of the Insured's business** during the term of this policy and **whom any Insured compensates by salary, wages and/or commissions and has the right to govern and direct in the performance of such service;** and shall also mean;

(A) Any non-compensated officer of any Insured....

(C) Any director or trustee of any Insured while performing acts coming within the scope of the usual duties of an Employee....

*Id.* at 14 (emphasis added).

B. Procedural history

1. Prior Litigation Between PEC and Aetna

PEC and Aetna's relationship commenced in early 1972, when Aetna first provided employee dishonesty and crime insurance to PEC. From the beginning, Robert Felzenberg sought to obtain for PEC non-cancelable insurance from Aetna. On February 7, 1976, he succeeded in convincing Aetna to amend its policy to be permanently non-cancelable except in the event that PEC failed to pay its premiums. When Aetna subsequently attempted to cancel its policy on May 2, 1980, PEC filed an action to prevent Aetna from doing so. PEC was eventually victorious in the litigation that ensued, and the Court of Appeals enjoined Aetna from canceling its policy except for non-payment of premiums. *See Payroll Express Corporation,* 659 F.2d at 292–93.

2. PEC's Bankruptcy Petition and the Commencement of the Bankruptcy Action

On June 5, 1992, Payroll Express Corporation and Payroll Express Corporation of New York filed their respective Chapter 11 petitions with the United States Bankruptcy Court for the Southern District of New York. On June 8, 1992, the Bankruptcy Court authorized the joint administration of both Chapter 11 cases. Plaintiff was appointed Trustee of PEC on June 26, 1992, and the estates of Payroll Express Corporation and Payroll Express Corporation of New York were substantively consolidated on November 18, 1992. *See* Amended Complaint at ¶¶ 11–14.

Plaintiff commenced an adversary proceeding against defendants on May 1, 1995, and defendants moved for a withdrawal of the reference of that proceeding. On July 24,

1995, I heard oral argument by the parties on that issue, and subsequently withdrew the reference of plaintiff's claims as a non-core proceeding. *See* Transcript of Oral Argument, dated July 24, 1995, at 46–51. *See also* Order Withdrawing Reference of Adversary Proceeding No. 95/9070A, dated August 16, 1995.

Since that time, I have made several rulings in this case. After hearing oral argument by the parties on December 1, 1995, I ruled that New Jersey law applies to plaintiff's claims of bad faith denial of coverage. *See* Transcript of Oral Argument, dated December 1, 1995, at 48. On January 23, 1996, I granted Aetna's motion to dismiss plaintiff's bad faith claims pursuant to Rule 12(b)(6), but denied LEU's motion to dismiss plaintiff's bad faith claims. *See In re Payroll Express Corp.*, No. 95 Civ. 4385, 1996 WL 22960 (S.D.N.Y. Jan. 23, 1996). I denied LEU's motion for reargument of my December 1 choice-of-law ruling and LEU's motion to certify this question for immediate appeal on April 3, 1996. *See In re Payroll Express Corp.*, 921 F.Supp. 1121 (S.D.N.Y.1996). Most recently, on August 8, 1997, I granted the motion of defendants Federal Insurance Company and Chubb Group of Insurance Companies for summary judgment pursuant to Rule 56. *See In re Payroll Express Corp.*, 216 B.R. 498 (S.D.N.Y.1997).

## IV. Discussion

### A. Choice of Law Question

These motions raise a threshold choice-of-law question, as the parties dispute whether New York or New Jersey law should apply to the plaintiff's breach of contract claims.[4] As noted, I previously held that New Jersey law applies to plaintiff's bad faith claims. However, at the time of that ruling I expressly declined to determine whether New Jersey or New York law applies to plaintiff's other

---

**4.** Aetna chose only to articulate its position regarding the law applicable to plaintiff's contract claims in its reply brief, perhaps because the parties debated this issue at an earlier stage of this case. This decision gave plaintiff no opportunity to rebut Aetna's arguments, which is un-

claims. *See In re Payroll Express Corp.* 921 F.Supp. at 1125, 1125 n. 5.

### 1. Choice-of-law Analysis

New York choice-of-law rules determine whether New York or New Jersey law applies to plaintiff's breach of contract claims. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir.1997). Under New York's current choice-of-law rules, courts no longer employ the traditional "territorially oriented" approach which "applied the law of the geographical place where one key event occurred, such as the place of the wrong in tort cases or where an agreement was entered into or performed in contract cases." *Lazard Freres & Co.*, 108 F.3d at 1539 (citing *Istim, Inc. v. Chemical Bank*, 78 N.Y.2d 342, 575 N.Y.S.2d 796, 798, 581 N.E.2d 1042 (1991)). Rather, New York courts "seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute". *Id.* (citing *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963)).

The Court of Appeals has recently explained the approach of New York courts to choice-of-law questions in contract cases:

> In contract cases, New York courts now apply a "center of gravity" or "grouping of contacts" approach. Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. New York courts may also consider public policy "where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests."

fortunate given the importance and complexity of the issue. *See Polycast Technology Corp. v. Uniroyal, Inc.*, 792 F.Supp. 244, 269 (S.D.N.Y.1992) (criticizing litigant's decision to raise new issues and arguments for the first time in reply brief).

*Lazard Freres & Co.*, 108 F.3d at 1539 (quoting *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1030–31 (2d Cir.1996) (citations omitted)). More specifically, in cases involving insurance contracts, New York courts have looked principally to the following factors: (1) location of the insured risk; (2) the insured's principal place of business; (3) where the policy was issued and delivered; (4) the location of the broker or agent placing the policy; (5) where the premiums were paid; and (6) the insurer's place of business. *See Olin Corp. v. Ins. Co. of North America*, 743 F.Supp. 1044, 1048–49 (S.D.N.Y.1990) (citing cases), *aff'd*, 929 F.2d 62 (2d Cir.1991).

Plaintiff argues that New Jersey law must apply for the following reasons: (1) Payroll Express Corporation was a New Jersey corporation and its principal place of business was in New Jersey; (2) all the major elements of the employee's fraud, including the check-kiting scheme and the use of false financial statements, occurred in New Jersey; (3) PEC's assets were fraudulently transferred from New Jersey bank accounts to other entities located primarily in New Jersey; (4) PEC paid its premiums from its New Jersey headquarters, and (5) applying New York law to plaintiff's breach of contract claims and New Jersey law to plaintiff's bad faith claims would be unnecessarily confusing. *See* Trustee's Memorandum of Law in Support of its Cross–Motion for Summary Judgment ("Trustee's Moving Memo") at 21–23.

In response, Aetna argues that New York law must be applied to plaintiff's breach of contract claims because (1) the Aetna policy was issued from its New York office and delivered to M&S at its New York office; (2) the principal location of the insured risk was in New York as most of PEC's customers were there; (3) PEC maintained offices and conducted business in both New York and New Jersey; (4) PEC forwarded premiums to an M&S subsidiary in New York. *See* Aetna's Reply Memorandum of Law at 9. In addition, LEU contends, New York law should apply because (5) PEC negotiated the policies through M&S in New York; and (6) LEU's policies were annually renewed by sending new policies to M&S in New York. *See* LEU's Memorandum in Support of Motion for Summary Judgment ("LEU's Moving Memo") at 3–4.

 Given the nature of the parties, their business, their contract, and the events that took place at PEC, it is difficult indeed to determine whether New York or New Jersey has a greater interest in this dispute. Accepting as true each of the contentions listed above, each state appears to have a roughly equal stake in the outcome of this litigation.[5] However, because I have already decided that New Jersey law applies to plaintiff's bad faith claims, the law of the case doctrine now tips the balance in favor of applying New Jersey law to plaintiff's remaining breach of contract claims.

### 2. Law of the Case Doctrine

 "Under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *In re PCH Associates*, 949 F.2d 585, 592 (2d Cir.1991) (citing, *inter alia*, *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16, 108 S.Ct. 2166, 2177–78, 100 L.Ed.2d 811 (1988)). The doctrine was "developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *Id.* (quoting 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4478, at 788 (1981)). While the law of the case doctrine is a discretionary rule of practice that does not limit the court's power to reconsider issues, *see id.*, a court should not lightly disregard the policy favoring consistency that it represents.

---

**5.** It is true, of course, that defendants listed a total of six factors that weigh in their favor, while plaintiff put forward only five. Yet this alone does not decide the issue, as New York's flexible "center of gravity" choice-of-law analysis is obviously designed to avoid such a formulaic approach. Rather, in considering the factors listed above in *Lazard Freres & Co.* and *Olin–Corp.*, courts must evaluate how much weight should be allotted to these factors given the specific facts of each case.

Earlier in the course of this litigation, I determined that (1) plaintiff was not judicially estopped from arguing that New Jersey law applies in this case, (2) plaintiff's bad faith claims sounded in contract under both New York and New Jersey law, and that (3) New York choice-of-law rules governing insurance contracts indicated that New Jersey law should apply to plaintiff's bad faith claims. *See In re Payroll Express*, 921 F.Supp. at 1123–26. As I am required to apply the same New York choice-of-law rules to plaintiff's breach of contract claims as I did to plaintiff's bad faith claims, the law of the case doctrine strongly militates in favor of concluding that New Jersey law must apply to plaintiff's breach of contract claims.

### 3. Pragmatic Considerations

Pragmatic considerations also support the application of New Jersey law to plaintiff's remaining claims. As at least one other federal court has recognized, it would be unduly confusing to both the parties and the Court to require plaintiff to prosecute bad faith claims under New Jersey law and breach of contract claims under New York law. *See The Home Ins. Co. v. Service America Corp.*, 654 F.Supp. 157, 159, (N.D.Ill.1987). Nor, as mentioned above, could such a result be reconciled easily with New York's choice-of-law rules, which apply the same analysis to both bad faith claims and breach of contract claims. New Jersey clearly has a substantial interest in this dispute, and New York's competing interest is (at this stage in the case) outweighed by the interest in avoiding the additional complexity that would result from applying two states' rules of decision to plaintiff's various contract claims. I therefore find that New Jersey law applies to plaintiff's breach of contract claims.

### B. LEU's Motion and Trustee's Cross–Motion

Plaintiff's cross-motion for summary judgment seeks a declaration that Robert Fel-

zenberg is a covered "employee" as a matter of law under the LEU Policies. *See* Plaintiff's Moving Memo at 1. However, for the reasons discussed below, I find that PEC's material misrepresentations on the LEU application form voided the LEU Policies *ab initio*. I therefore need not reach the question raised by plaintiff's cross-motion.

### 1. PEC's Response to Question 10

■ It is not disputed that PEC disclosed only one loss of $1.5 million in response to question 10, when in fact it had sustained 17 other theft and robbery losses totaling over $3 million during the five years prior to the date of PEC's application. *See* LEU 56.1 Statement at ¶¶ 16–17. LEU now argues that PEC's failure to respond accurately to question 10 constituted a material misrepresentation that renders the LEU Policies void *ab initio*.[6]

In response, plaintiff makes three separate arguments. First, plaintiff contends that LEU was actually or constructively informed of at least three of the allegedly undisclosed losses through a report prepared by American Security Services, Inc. ("AMSEC"), and was actually or constructively informed of each of the undisclosed losses through M&S acting as LEU's "agent". Second, plaintiff maintains that any misrepresentations that may have been made on the application were not material. Third, plaintiff argues that question 10 is ambiguous, and that PEC reasonably interpreted the question to request information only pertaining to prior covered losses. *See* Plaintiff's Amended Memorandum in Opposition to LEU's Motion ("Plaintiff's Opposition to LEU") at 3–8. Each of these arguments is discussed below.

■ Even if LEU had actual or constructive knowledge of three of the undisclosed losses through the AMSEC report, plaintiff has failed to address the remaining three

---

**6.** "New Jersey law generally provides that, 'a misrepresentation by the insured, whether contained in the policy itself or in the application for insurance, will support a forfeiture of the insured's rights under the policy if it is untruthful, material to the particular risk assumed by the insurer, and reasonably relied upon by the insur-

er issuing the policy.'" *F.D.I.C. v. Moskowitz*, 946 F.Supp. 322, 329 (D.N.J.1996) (quoting *Williams v. American Home Assurance Co.*, 121 N.J.Super. 351, 361, 297 A.2d 193 (App.Div. 1972), *certif. denied*, 62 N.J. 260, 300 A.2d 344 (1973)).

undisclosed losses that took place before the report was issued (totaling $326,000). In addition, it is not disputed that PEC suffered eleven other undisclosed losses (totaling $2,037,086) after the AMSEC report was issued and before PEC applied for the LEU Policies. As plaintiff's AMSEC argument does not address PEC's failure to disclose losses in excess of $2.3 million, it cannot expect to defeat LEU's motion by pointing to three other losses of which LEU may have known.

■ Plaintiff's contention that LEU had constructive knowledge of the undisclosed losses through its agent M&S lacks any legal or factual basis. Brokerage firms such as M&S have generally been held to act as agents for the insureds whose coverage they place. *See* Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* ("Ostrager & Newman") § 18.02[b] at 757 (citing cases). Yet it has also been widely recognized that brokers may at times act as the insurer's agent, or as a dual agent of both the insured and the insurer, and that the classification of a broker's "agency" status will turn on the specific facts of each case. *See id.* § 18.02[c] and [d] at 758–760 (citing, *inter alia*, *Travelers Indemnity Co. v. National Indemnity Co.*, 292 F.2d 214, 220 (8th Cir.1961)).

■ Under New Jersey law, which has adopted the principles above, "[a]n agency relationship arises when one party authorizes another to act on its behalf while retaining the right to control and direct any such acts." *Evangelou v. Terzano*, 298 N.J.Super. 467, 475, 689 A.2d 840 (App.Div.1997) (citing, *inter alia*, *Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 337, 634 A.2d 74 (1993)). New Jersey courts have drawn the following distinction between insurance agents and brokers:

> In comparison to an agent, a broker is one engaged in the business of procuring insurance for such persons as may apply to [her] for that purpose. [She] is a specialist holding [her]self out to the world as [ ] a middleman between the insured and the insurance company. [She] is usually the agent of the insured.

*Id.* at 475–76, 689 A.2d 840 (quotations and citations omitted). In determining whether a person or entity is an agent or broker, "the power to bind the insurer to coverage is the critical distinction between broker and agency status". *Id.* (quotations and brackets omitted).

Although both LEU and PEC attempt to claim that M&S acted as the other's agent, this broad issue need not be decided. Here, the inquiry must focus on whether plaintiff has produced any evidence from which a reasonable inference may be drawn that M&S acted as LEU's agent for the purposes of determining whether PEC had suffered any losses during the five years prior to the submission of the LEU application.

The record reveals that, before it had any relationship with LEU, PEC had used M&S to obtain insurance coverage, to answer questions from PEC's customers about PEC's insurance, to assist PEC in obtaining annual renewals of its insurance, and to report PEC's insurance claims to its insurers. *See* LEU's 56.1 Statement, Ex. 33 at 32–37 (Deposition of Frank Maranto, Vice President of M&S, dated March 18, 1997). It also appears that M&S acted as the middleman between PEC and LEU, and helped PEC negotiate its insurance policies with LEU. *See id.* at 36. John O'Shea, the president of M & S, has testified that M&S did not act as LEU's agent and was not authorized to do so. *See* LEU's 56.1 Statement, Ex. 34 at 74–75 (Deposition of John O'Shea, dated May 8, 1997). Maranto has corroborated this testimony. *See* LEU's 56.1 Statement, Ex. 33 at 39. The record suggests that there was no written agreement between LEU and M&S. *Id.* at 76. Plaintiff has submitted no evidence from which a finder of fact reasonably could infer that M&S was LEU's agent for purposes of determining PEC's prior loss history before the LEU application was signed and submitted. Thus, plaintiff's claim that LEU had constructive knowledge of the undisclosed losses through its agency relationship with M&S is unavailing.

■ Nor can there be any question that these omissions constituted material misrepresentations as a matter of law. Under established New Jersey law, a misrep-

resentation to an insurer is material if it "naturally and reasonably influence[d] the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium." *Booker v. Blackburn,* 942 F.Supp. 1005, 1011 (D.N.J.1996) (quoting *Ledley v. William Penn Life Ins. Co.,* 138 N.J. 627, 638, 651 A.2d 92 (1995) (citing *Massachusetts Mutual Life Ins. Co. v. Manzo,* 122 N.J. 104, 115, 584 A.2d 190 (1991))). Stated another way, a misrepresentation is material under New Jersey law if it is "reasonably related to the estimation of risk or the assessment of the premium." *Manzo,* 122 N.J. at 117, 584 A.2d 190.[7] The intent of the insured is not relevant to the materiality inquiry, for under New Jersey law even "innocent misrepresentations" may serve as a basis for rescission. *Moskowitz,* 946 F.Supp. at 329 (quoting *Ledley,* 138 N.J. at 635, 651 A.2d 92).

■ Plaintiff now argues that the undisclosed losses were not material because of their relatively small size. Yet uncontroverted evidence shows that each of these losses ranged from $36,000 to $285,000, and that the average undisclosed loss was over $170,000. *See* LEU's Moving Memo at 7 (citing LEU's 56.1 Statement, Exs. 16–32[8] ). Furthermore, each of these losses exceeded the LEU deductible of $25,000. Plaintiff's characterization of the undisclosed losses as "inconsequential" is rejected.

■ Plaintiff also maintains that the materiality of PEC's response to question 10 is a question of fact that must be resolved at trial. *See* Plaintiff's Opposition to LEU's Motion at 4–5. This argument is without

merit. The materiality of an insured's misrepresentation to an insurer is ordinarily a factual question left for the jury's determination, but where reasonable minds could reach only one conclusion as to that issue the court must resolve it as a matter of law.

Courts throughout the United States have recognized that "[c]ommon sense tells us that an applicant's prior loss history is material to a reasonable insurance company's decision whether to insure that applicant or determination of the premium." *Pinette v. Assurance Co. of America,* 52 F.3d 407, 411 (2d Cir.1995) (deciding question of materiality of misrepresentations under Connecticut law). *See also Howell v. Colonial Penn Ins. Co.,* 842 F.2d 821, 823–824 (6th Cir.1987) (under Tennessee law "an insured's prior loss history is a factor that a reasonable and prudent insurer would take into account in issuing a policy"); *Certain Underwriters at Lloyd's v. Montford,* 52 F.3d 219, 222 (9th Cir.1995) (same under California law). These cases affirm the basic notion that an applicant's prior loss history is necessarily relevant to the insurer's calculation of risk, and that "an insurer, in making underwriting decisions and in setting premiums for the risks it underwrites[,] has the right ... to secure information from the applicant, and to rely upon the information furnished as true and to govern its actions accordingly." Ostrager & Newman § 3.02 at 84 (quotation omitted).

■ Plaintiff's arguments are also directly controverted by the facts of this case. Roberts testified that the undisclosed losses "indicate[ ] the inadequacy of PEC's staffing, security systems, management and internal controls", and that "[h]ad PEC disclosed this material information in a timely manner, the

---

**7.** The Supreme Court of New Jersey has expressly rejected the argument that a misrepresentation must render the insured "uninsurable" (i.e., that the insurer would not have issued any policy to the insured but for the misrepresentation) to be considered material: "Under such a test, an insurer would be bound unless the [misrepresentation] would have precluded the issuance of the policy. Thus, the dishonest applicant would stand to gain if the lie goes undetected and would risk nothing by lying." *Manzo,* 122 N.J. at 115, 584 A.2d 190.

**8.** Plaintiff objects to the admission of these exhibits on the ground that they constitute inadmis-

sible hearsay. However, these exhibits appear to be property loss notices prepared by M&S based on claims submitted by Robert Felzenberg on behalf of PEC. *See* LEU's 56.1 Statement, Exs. 16–32 (property loss notices). Robert Felzenberg's statements to M&S are admissions of PEC and are not hearsay under Rule 801(d)(2)(A) of the Federal Rules of Evidence. This admission was incorporated by M&S on a standard form. *See* LEU's 56.1 Statement, Ex. 83 (Affidavit of Frank Maranto, Vice President of M&S, dated July 21, 1997) ("Maranto Aff."). These exhibits are therefore admissible evidence.

London Excess Underwriters would not have agreed to insure PEC." *See* LEU's 56.1 Statement, Ex. 4 (Declaration of Angus John Roberts, Lead LEU Underwriter, dated June 9, 1997) ("Roberts Decl.") at ¶¶ 11–12. As explained above, whether LEU would have insured PEC had it known of the undisclosed losses is besides the point. Rather, the pertinent question is whether those losses "naturally and reasonably influence[d] the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium", *Booker,* 942 F.Supp. at 1011, or whether they were "reasonably related to the estimation of risk or the assessment of the premium", *Manzo,* 122 N.J. at 117, 584 A.2d 190.

The only evidence plaintiff presents in support of its argument that the undisclosed losses were not material is the deposition testimony of Frank Maranto. *See* Affidavit of Peter J. Andrews, counsel for plaintiff, dated August 15, 1997, Ex. 91 at 345–346 (Deposition of Frank Maranto, dated March 19, 1997). Mr. Maranto was asked the following question by plaintiff's counsel:

> Sitting here today and based on your experience with applications like this and with Payroll Express, do you view [Mr. Felzenberg's interpretation of question 10] to be a reasonable one?

*Id.* at 345. Mr. Maranto answered:

> I would just like to say this is a little unusual in that it doesn't follow the same format. Because normally you have to worry about the deductible. They're so small and many times can range from 5 to 25,000 bucks. So who really cares. This is a situation where you have a substantial amount of money under the primary level. It doesn't make any difference because all these things are inspected by American Security.

*Id.* at 346. Plaintiff now argues that a question of fact exists as to the materiality of the undisclosed losses because (1) Maranto was an agent of LEU, and (2) his statement above lends credence to the plaintiff's contention that those losses were not material.

Maranto's statement, however, does not create a genuine issue of fact regarding the materiality of the undisclosed losses. Rather, it seems only to indicate that Robert Felzenberg might have reasonably concluded that small losses between the value of $5 to $25,000 might not be of interest to LEU, and that LEU would in any event confirm the accuracy of PEC's response to question 10 by checking AMSEC's reports. Yet here the undisclosed losses were each greater than $25,000, and over $2 million of those losses were suffered after AMSEC's report was issued. Maranto's statement therefore in no way raises a factual question as to whether the undisclosed losses were reasonably related to LEU's calculation of risk regarding the PEC Policies. As plaintiff has presented no evidence that could reasonably lead a jury to conclude that the undisclosed losses were not "material" misrepresentations, they must be deemed material as a matter of law.

Finally, plaintiff argues that question 10 was ambiguous, and that PEC reasonably believed that it was obliged to disclose losses that would be covered under the LEU Policies. As the Third Circuit has recently explained, under basic principles of New Jersey law the question of whether an insurance contract is ambiguous is a question of law. *See Pittston Co. Ultramar America Ltd. v. Allianz Ins. Co. et al.,* 124 F.3d 508, 520 (3d Cir.1997). In determining whether a contract is ambiguous, courts may not "torture the language of a contract to create ambiguity where none exists." *Id.* (quoting *Pennbarr Corp. v. Ins. Co. of North America,* 976 F.2d 145, 151 (3d Cir.1992) and citing *Longobardi v. Chubb Ins. Co. of New Jersey,* 121 N.J. 530, 582 A.2d 1257 (1990)). Rather, "[w]hen the terms of an insurance contract are clear ... it is the function of a court to enforce it as written and not make a better contract for either of the parties." *Id.* (quotations from *State v. Signo Trading Int'l. Inc.,* 130 N.J. 51, 612 A.2d 932 (1992) removed). Thus, "[i]n establishing ambiguity, the insured must do more than suggest a possible alternative reading of the contract; it must also offer an objectively reasonable reading of the disputed passage". *Id.* (quotation omitted).

There is no ambiguity in question 10 as to whether PEC was obliged to disclose only those losses within the scope of the LEU Policies. PEC was asked if it had suffered a loss in the prior five years, and to give the details if it had. The phrase "a loss" cannot be transmuted into "a *covered* loss" by advocacy alone; to do so would fundamentally alter the only plain meaning of question 10 and inappropriately re-write the LEU application. PEC was obliged to disclose its losses whether they were covered or not, and Robert Felzenberg's material misrepresentations regarding the undisclosed losses serve as a basis to rescind each of the LEU Policies. Accordingly, LEU's motion for summary judgment with respect to plaintiff's breach of contract claims must be granted.

### 2. PEC's Response to Question 36

▮ Because PEC's response to question 10 provides adequate grounds to rescind the LEU Policies, LEU's arguments regarding question 36 do not require a lengthy discussion. However, I address the issue briefly because PEC's response to that question is an alternative basis on which LEU is entitled to rescind the LEU Policies. Plaintiff now argues that the question was ambiguous and overbroad, and that Robert Felzenberg's responses cannot be imputed to PEC under the doctrine of "adverse domination".

Question 36 is a type of "catch-all" information-seeking inquiry that often appears in insurance applications. It requested that PEC provide "any other information which is or may become material to the proposed insurance and which is not already disclosed". LEU's 56.1 Statement at ¶ 24. This broadly phrased question provides little guidance to the applicant as to what the insurer might consider "material" to the proposed insurance, and is clearly a "subjective" question "directed toward probing the knowledge of the applicant and determining the state of his mind". *Ledley*, 138 N.J. at 636, 651 A.2d 92 (quoting *Ettelson v. Metropolitan Life Ins. Co.*, 164 F.2d 660, 665 (3d Cir.1947)).[9] Thus, under certain circum-

stances, an applicant might have no duty to provide information in response to question 36.

However, it is now undisputed that Robert Felzenberg and Barbara Felzenberg had continuously embezzled from PEC for over ten years prior to PEC's application for the LEU Policies. Furthermore, Robert Felzenberg knew that other individuals besides Barbara Felzenberg (such as Gillmore) had assisted him in his defalcations, and that these other individuals might arguably fall within the proposed insurance policies' definition of "employee", thus exposing LEU to liability for the harm that they caused. It is therefore beyond cavil that Robert Felzenberg knew or should have known that knowledge of the existence of his scheme (as well as knowledge of its other participants) would be reasonably related to LEU's calculation of the risk it would bear under the LEU Policies. Plaintiff cannot prevail by now arguing that question 36 is so "ambiguous" that Robert Felzenberg's response to it was reasonable.

▮ Nor do I accept plaintiff's "adverse domination" theory, for which it cites a bankruptcy court opinion from the Eastern District of Pennsylvania. *See* Plaintiff's Opposition to LEU's Motion at 11 (citing *In re Lloyd Securities*, 153 B.R. 677 (E.D.Pa. 1993)). In a broad sense, the holding of this case rests on the theory that equity will not allow a corporation to suffer for the wrongdoings of the individuals by which it is controlled. More specifically, however, the bankruptcy court applied the "adverse domination" theory to equitably toll the insured's obligation to notify the insurer of a loss "[a]t the earliest practicable moment". *Id.* at 684 (citing *Resolution Trust Corp. v. Gardner*, 798 F.Supp. 790 (D.D.C.1992)).

As plaintiff is not requesting that PEC's notice requirements be equitably tolled, plaintiff's reliance on the holding of *In re Lloyd Securities* (which has never been adopted by any New Jersey court) is misplaced. Furthermore, plaintiff's broader argument that equity will not permit PEC to

---

9. New Jersey courts have "been more lenient when reviewing an applicant's misrepresentation made in response to a subjective question than to an objective question." *Ledley*, 138 N.J. at 636, 651 A.2d 92.

suffer the results of Robert Felzenberg's dishonest conduct [10] is undermined by the undisputed facts of this case. PEC was entirely controlled, directed and owned by Robert Felzenberg and Barbara Felzenberg. No shareholder, director, officer, trustee or employee of PEC will suffer unjustly if Robert Felzenberg's misrepresentations are imputed to the beneficiary of the LEU Policies. Accordingly, plaintiff's attempt to interpose PEC's corporate form to avoid the consequences of Robert Felzenberg's material misrepresentations is rejected.

## C. Aetna's Motion

Plaintiff has expressly stated that he does not seek coverage from Aetna for losses caused by Robert Felzenberg to PEC. *See* Plaintiff's Memorandum of Law in Opposition to Aetna's Motion ("Plaintiff's Aetna Opposition Memo") at 1. However, plaintiff does argue that Barbara Felzenberg is a covered employee under the Aetna Policy, and that Aetna is liable for losses caused by Barbara Felzenberg and other defalcating employees to PEC. *See id.* Aetna moves for summary judgment on the grounds that (1) all of PEC's losses were caused by Robert Felzenberg and Barbara Felzenberg; and (2) Robert Felzenberg and Barbara Felzenberg were the alter egos of PEC and were therefore not "employees" as that term is defined in the Aetna Policy. In presenting its "alter ego" defense, Aetna conflates two distinct "alter ego" doctrines, to which I shall refer below as the "equitable alter ego doctrine" and the "contractual alter ego doctrine". While Aetna did not distinguish between the two doctrines, analytical clarity requires that I address them separately.

### 1. Aetna's Equitable Alter Ego Doctrine Argument

 Aetna's first argument may be summarized by the following syllogism: (1) it is universally accepted that "no one shall be permitted to profit from his own fraud, or to take advantage of his own wrong, or to found

a claim upon his own iniquity, or to acquire property by his own crime." *Riggs v. Palmer*, 115 N.Y. 506, 511, 22 N.E. 188 (1889); (2) equity requires PEC's corporate form to be disregarded and thus PEC should be deemed the "alter ego" of Robert Felzenberg and Barbara Felzenberg; and (3) therefore, PEC may not be allowed coverage under Aetna Policy for losses caused by the defalcations of Robert Felzenberg and Barbara Felzenberg.

Aetna's contention that Robert Felzenberg and Barbara Felzenberg should be deemed PEC's "alter ego" as a matter of law rests on the undisputed fact that Robert Felzenberg and Barbara Felzenberg were PEC's directors, that they owned and dominated PEC, and that no other person at PEC had the right to govern and direct their activities. *See* Aetna's 56.1 Statement at ¶¶ 16, 26–27. Aetna cites several cases to support the proposition that corporate officers that dominate and control a corporation must be considered its alter ego. However, none of these cases were decided under New Jersey law. *See* Aetna's Memorandum of Law in Support of Motion for Summary Judgment ("Aetna's Moving Memo") at 16–17.

 New Jersey has not adopted such a broad interpretation of the alter ego doctrine. Rather, New Jersey law recognizes that a corporation is a separate entity from its shareholders, and that the separate form of even a closely held corporation will be generally upheld. *See State of New Jersey Department of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 500, 468 A.2d 150 (1983) (citing, *inter alia, Lyon v. Barrett*, 89 N.J. 294, 300, 445 A.2d 1153 (1982) and Adolph Berle, *The Theory of Enterprise Entity*, 47 Colum.L.Rev. 343 (1947)). As one court explained:

> The fact that a closely held corporation is owned by one or two shareholders or family members is not sufficient in and of itself to undermine the corporate identity. Furthermore, closely held corporations which provide limited liability to individuals and partners in business have been judicially

---

**10.** This argument rests in part on the assumption that Robert Felzenberg prepared the LEU application by himself. However, plaintiff alleged previously that Robert Felzenberg "was assisted by others" in preparing the LEU application. *See* Plaintiff's Counter Statement to LEU's 56.1 Statement at ¶ 13.

recognized and legally accepted. It is a well-settled rule that ownership or all or almost all the shares by one individual or a few individuals does not afford sufficient grounds for disregarding corporateness. *Coppa v. Taxation Division Director,* 8 N.J.Tax 236, 245 (1986).

 However, New Jersey courts have disregarded the corporate form to impose individual liability when shareholders' conduct requires that they do so: "The shareholder who refuses to draw a line between his individual and corporate affairs is in a poor position to ask that the court effect what he failed to do." *Id.* The equitable alter ego doctrine teaches that courts should disregard the corporate form and impose liability on an individual stockholder when:

(1) the stockholders' disregard of the corporate entity make [sic.] it a mere instrumentality for the transaction of their own affairs;

(2) there is such a unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist;

(3) to adhere to the doctrine of the corporate entity would promote injustice or protect fraud.

*Id.* (citing Fletcher, *Cyclopedia of the Laws of Private Corporations* (Perm ed. 1983 rev. vol.) at 397).[11] *See also Ventron Corp.,* 94 N.J. at 500–501, 468 A.2d 150; *Major League Baseball Promotion v. Colour-Tex,* 729 F.Supp. 1035, 1046 (D.N.J.1990) (defining elements required to pierce corporate veil) (citing, *inter alia, Mueller v. Seaboard Commercial Corp.,* 5 N.J. 28, 34–39, 73 A.2d 905 (1950) and *Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 149 (3d Cir.1988)). *See generally* Presser § 2.31 (describing New Jersey veil-piercing law).

Aetna has failed to establish that PEC had no other purpose but to further the personal interests of Robert Felzenberg and Barbara Felzenberg. It is undisputed that PEC func-

tioned as a legitimate business entity engaged in the enterprise of cashing payroll checks for over 20 years. PEC employed several individuals, kept its own books and appears to have had its own bank accounts, creditors and clients. Thus, while it is true that Robert Felzenberg and Barbara Felzenberg may have systematically looted PEC for their own gain, PEC's corporate form appears to have served many legitimate business purposes. I cannot find that Robert Felzenberg and Barbara Felzenberg's "disregard of the corporate entity" has reduced PEC to "a mere instrumentality for the transaction of their own affairs". *Coppa,* 8 N.J.Tax at 245. Nor can I find that "there is such a unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist". *Id.* Accordingly, Aetna's equitable alter ego doctrine argument must be rejected.

2. Aetna's Contractual Alter Ego Doctrine Argument and Coverage of Losses Caused by Barbara Felzenberg

 Plaintiff does not dispute that Barbara Felzenberg owned 50% of PEC, was an officer and director of PEC, had check signing and signature authority for PEC, and had authority to execute loans on behalf of PEC. *See* Aetna's 56.1 Statement at ¶¶ 16, 18, 21, 23. Plaintiff also conceded that Robert Felzenberg and Barbara Felzenberg "dominated and controlled PEC" and that "[n]o one at PEC governed and directed Robert Felzenberg or Barbara Felzenberg in the performance of their services to PEC". *Id.* at ¶¶ 26–27. It is also not disputed that Barbara Felzenberg authorized and received loans from PEC, and that Barbara Felzenberg utilized PEC funds to buy jewelry and securities. *See id.* at ¶¶ 47–49.

Aetna contends that, given these undisputed facts, Barbara Felzenberg cannot be considered an "employee" as that term is defined by the Aetna Policy.[12] In support of

**11.** The "alter ego doctrine" is cousin to the "piercing the veil" doctrine. Both doctrines flow from the equitable notion that courts should disregard the corporate form when the liability in question "is not really a debt of the corporation, but ought, in fairness[,] to be viewed as a

debt of the individual or corporate shareholder or shareholders." Stephen B. Presser, *Piercing the Corporate Veil* ("Presser") § 1.01 at 1–6 (1996).

**12.** As stated above, section 3 of the Conditions and Limitations portion of the Aetna Policy de-

this argument, Aetna relies on a line of cases that have held that a shareholder that dominates and controls a corporation cannot as a matter of law be considered an employee if that term is defined as an individual whom the corporation has a right to govern and direct. *See Bird v. Centennial Ins. Co.,* 11 F.3d 228 (1st Cir.1993); *In re World Hospitality Ltd.,* 983 F.2d 650 (5th Cir.1993); *California Union Ins. Co. v. American Diversified Savings Bank,* 948 F.2d 556 (9th Cir. 1991); *Kerr v. Aetna Casualty and Surety Co.,* 350 F.2d 146 (4th Cir.1965); *In re Prime Commercial Corp.,* 187 B.R. 785 (Bankr. N.D.Ga.1995); *Three Garden Village Ltd. Partnership v. United States Fidelity & Guaranty Co.,* 318 Md. 98, 567 A.2d 85 (1989); *Employer's Admin. Services, Inc. v. Hartford Accident and Indemnity Co.,* 147 Ariz. 202, 709 P.2d 559 (1985). *Accord General Finance Corp. v. Fidelity and Casualty Company of New York,* 439 F.2d 981 (8th Cir.1971); *Insurance Co. of North America v. Greenberg,* 405 F.2d 330 (10th Cir.1969).

These cases involved efforts—generally by a bankrupt corporation's trustee or receiver [13]—to recover on employee dishonesty insurance policies for losses caused by the defalcations of a majority shareholder that dominated and controlled the corporation. Additionally, the insurance policies in these cases defined the term "employee" as an individual whom the insured has "the right to govern and direct" in the performance of his or her services to the corporation. Each court rejected "the claim that the theoretical right to govern and direct a dominant corporate actor is sufficient to render that actor an employee under the definition of employee set forth in the [insurance] Policies." *Bird,* 11 F.3d at 233 (citing *Hartford Accident and Indem. Co.,* 709 P.2d at 562–63; *Kerr,* 350 F.2d at 154–55; *In re World Hospitality,* 983 F.2d at 651–53; *California Union Ins. Co.,* 948 F.2d at 566; and *Three Garden Village*

*Ltd. Partnership,* 567 A.2d at 90–92). *See also In re Prime Commercial Corp.,* 187 B.R. at 797–799. As the First Circuit explained, "[w]e think it apparent that the 'right' to govern and direct referred to in the [insurance] Policies must be more than an ephemeral right inhering generally in the corporate form; rather, it must have some grounding in reality." *Bird,* 11 F.3d at 233.

Following this reasoning, each court found that the defalcating shareholder could not be considered an "employee" within the insurance policy's definition of that term because the corporation had no actual (as opposed to theoretical) right to govern and direct the defalcating shareholder. Rather, such a shareholder must more properly be considered the corporation's "alter ego".[14] As the Court of Appeals for Maryland stated, "it would be unreasonable to assume that the [insurer] would insure the conduct of any [shareholder] thus situated. An undertaking insuring a person against his own dishonesty would be, to say the least, a novel and unusual contract." *Three Garden Village Ltd. Partnership,* 567 A.2d at 91–92 (quotation omitted).

Several of the cases cited above also relied on the same policy considerations underlying the equitable alter ego doctrine discussed above. As explained by the Fifth Circuit,

[T]here is a strong policy reason for denying the corporation coverage under the bonds in question. A corporation can only act through its officers and directors. When one person owns a controlling interest in the corporation and dominates the corporation's actions, his acts are the corporation's acts. Allowing the corporation to recover for the owner's fraudulent or dishonest conduct would essentially allow the corporation to recover for its own fraudulent or dishonest acts. The bonds, however, were clearly designed to insure

---

fines employees as "any natural person ... whom the Insured compensates by salary, wages or commissions and **has the right to govern and direct in the performance of such service."** *Id.* at ¶ 6 (emphasis added).

**13.** The plaintiffs in *Greenberg* and *Three Garden Village Ltd. Partnership* were neither trustees nor receivers.

**14.** The use of the term "alter ego" in this context is used "as a shorthand way of identifying any natural person whom the corporate insured does not have 'the right to govern and direct' ". *Bird,* 11 F.3d at 231 n. 3. Thus, the term as used in this context should be distinguished from the equitable alter ego doctrine. *See id.* at 232 n. 6.

the corporation against their employee's dishonest acts and not their own dishonest acts. *See California Union,* 948 F.2d at 566.

*In re World Hospitality Ltd.,* 983 F.2d at 652. *See also Bird,* 11 F.3d at 233 n. 7 (articulating same policy considerations); *California Union Ins. Co.,* 948 F.2d at 566 (same); *Hartford Accident & Indemnity Co.,* 709 P.2d at 563 (same).

While these cases do not control decisions under New Jersey law, they establish an unopposed majority rule that is directly applicable to the facts of this case. As stated earlier, it is not disputed that Barbara Felzenberg owned half of PEC's stock, Barbara Felzenberg "dominated and controlled PEC" and that "[n]o one at PEC · governed and directed ... Barbara Felzenberg in the performance of [her] services to PEC". Aetna's 56.1 Statement at ¶¶ 26–27. It is also not disputed that Barbara Felzenberg authorized and received loans from PEC, and that Barbara Felzenberg utilized PEC funds to buy jewelry and securities. *See id.* at ¶¶ 47–49. These facts indicate that there is no basis for a finding that PEC had the right to govern and direct Barbara Felzenberg. Accordingly, Barbara Felzenberg was not an "employee" as that term was defined by the Aetna Policy, and Aetna's motion must be granted with regard to any PEC losses caused by Barbara Felzenberg.[15]

### 3. Losses Caused by Other Defalcating Individuals

█ Although it is not liable for PEC losses caused by Robert Felzenberg or Barbara Felzenberg, Aetna's victory is not complete. Aetna asserts that Robert Felzenberg and Barbara Felzenberg were the originators and masterminds of the scheme to loot PEC,

and that the other defalcating employees were merely pawns that carried out their masters' orders. Thus, Aetna claims, PEC would have suffered no covered losses but for Robert Felzenberg and Barbara Felzenberg. Under this theory, all PEC's covered losses must be attributed solely to Robert Felzenberg and Barbara Felzenberg, and Aetna cannot be deemed liable under its employee dishonesty Policy.

While plausible, Aetna's version of the events is not the only possible scenario. Plaintiff alleges that Gillmore, Messer, Robert Gussow, Rose Felzenberg, Emily Felzenberg and Alicia Felzenberg (the "other defalcating employees") were covered PEC employees and that they caused PEC losses through their dishonest conduct.[16] Aetna contends that it is not liable for any losses caused by the other defalcating employees because Section 2(a) of the Aetna Policy excludes losses caused by Robert Felzenberg or Barbara Felzenberg acting "in collusion with others." This arguments mischaracterizes plaintiff's position. Plaintiff does not argue that the other defalcating employees merely assisted Robert Felzenberg and Barbara Felzenberg in their scheme to loot PEC. Rather, plaintiff alleges that some PEC losses are "due to" the dishonest conduct of the other defalcating employees, not Robert Felzenberg or Barbara Felzenberg, because their dishonest actions were committed without the direction of Robert Felzenberg and Barbara Felzenberg.

Plaintiff has produced some evidence that Gillmore may have fallen within the Aetna Policy's definition of employee. *See* Plaintiff's Counter Statement to LEU's 56.1 Statement at Exs. 37–39 (indicating that Gillmore was PEC's comptroller, and that Robert Felzenberg testified that he believed Gillmore was PEC's "bona fide" employee). Further-

**15.** Plaintiff has presented various documents as extrinsic evidence of Aetna's understanding that Barbara Felzenberg was a covered employee. *See* Plaintiff's Aetna Opposition Memo at 4–6. However, where a contract is clear and unambiguous on its face (as is the Aetna Policy's definition of the term "employee"), parties may not resort to the use of extrinsic evidence to construe a contractual phrase or term. *See Norman v. Beling,* 33 N.J. 237, 243, 163 A.2d 129 (1960); *Taylor v. Continental Group Change in Control Severance Pay Plan,* 933 F.2d 1227, 1234

(3d Cir.1991) (citing, *inter alia, Thermice Corp. v. Vistron Corp.,* 832 F.2d 248, 252 (3d Cir.1987)).

**16.** Alicia and Emily Felzenberg are the daughters of Robert Felzenberg and Barbara Felzenberg. Rose Felzenberg is Robert Felzenberg's mother, and Robert Gussow was Barbara Felzenberg's father. *See* Andrews Aff., Ex. 102 at 112; Affidavit of Arthur N. Lambert, counsel for Aetna, dated July 29, 1997, ("Lambert Aff.") Ex. B.

more, there is evidence that Gillmore authorized PEC's wire transfers, that he received personal loans from PEC, that Robert Felzenberg does not recall if Gillmore ever repaid these loans, and that Gillmore used these loans to purchase a car, to make home improvements and to buy stocks. *See id.* at Exs. 39, 53. Plaintiff has also produced evidence that Gillmore received a payment in the amount of $74,375 from a Robert Felzenberg-controlled bank account. *See id.* at Ex. 54. It is reasonable to infer from this evidence that Gillmore was a covered employee and that his independent dishonest actions caused losses to PEC.

Plaintiff has also produced evidence that Robert Gussow ("Gussow")[17], Rose Felzenberg, Howard Messer ("Messer"), Alicia Felzenberg and Emily Felzenberg worked for PEC. *See* Affidavit of Peter J. Andrews, counsel for plaintiff, dated August 15, 1997, at Exs. 101–103. Based on this evidence, a reasonable trier of fact could certainly find that these individuals were covered employees under the Aetna Policy. Thus, if they independently caused losses to PEC through dishonest conduct, those losses are covered by the Aetna Policy.

Although plaintiff may have difficulty convincing a jury that Messer, Gussow and Rose Felzenberg were responsible for PEC losses that would be covered by the Aetna Policy, there is some evidence to support that claim. For example, Rose Felzenberg has refused to be deposed on the grounds that she is too ill, and her failure to cooperate with plaintiff's investigation of PEC's losses is probative evidence that she may be attempting to conceal her own dishonest conduct. Plaintiff's counsel states that despite "considerable efforts", Howard Messer has not yet been located. *See id.* at ¶ 21. Messer's failure to respond to counsel's "considerable efforts" to locate him may be probative evidence of his unwillingness to cooperate with plaintiff's discovery efforts, and provides an adequate basis from which to infer that he too is attempting to conceal his own dishonest conduct. Furthermore, plaintiff has presented some evidence that Messer, Gussow and Rose Felzenberg received funds in addition to their

regular compensation from PEC or other companies controlled by Robert Felzenberg and Barbara Felzenberg. *See* Lambert Aff., Ex. C at 14–16 (Trustee's Proof of Loss).

There is, however, no probative evidence to suggest that any PEC losses were "due to" the dishonest conduct of Alicia or Emily Felzenberg. The record shows that both worked at PEC for approximately 10 weeks during high school or early college. *See* Andrews Aff. at Ex. 102 (Gillmore Deposition, dated April 25, 1997, at 112–114.). It is therefore unclear whether they were minors at the time of their employment at PEC. Also, while plaintiff alleged "upon information and belief" that Alicia and Emily Felzenberg received "illicit benefits" from PEC because their tuition and living expenses were paid from PEC funds, there is no evidence in the record to support that allegation. Amended Complaint at ¶¶ 197–198.

 Plaintiff argues that because Alicia and Emily Felzenberg asserted their Fifth Amendment privilege during their depositions on June 28, 1994, a trier of fact may infer—for purposes of deciding plaintiff's breach of contract claims—that Alicia and Emily Felzenberg independently caused losses to PEC through dishonest conduct. It is true that, under certain circumstances, an adverse inference may be drawn against a civil litigant from a non-party's assertion of her Fifth Amendment privilege. *See Brink's Inc. v. City of New York,* 717 F.2d 700, 710 (2d Cir.1983) (former employees' assertion of the Fifth Amendment could be viewed as vicarious admission of former employer and was admissible and competent evidence). Yet such an inference may be drawn when the non-party's relationship with a party to the litigation is so close that her assertion of Fifth Amendment rights may be viewed as a vicarious admission of that party. *See LiButti v. United States,* 107 F.3d 110, 123 (2d Cir.1997) (outlining non-exclusive factors to be considered in determining whether adverse inference may be drawn from non-party's assertion of Fifth Amendment privilege). Because there is no evidence that Alicia and Emily Felzenberg have any rela-

---

**17.** Gussow, who managed PEC's New York office, is now deceased.

tionship with plaintiff or Aetna, and because of their youth, it would be unreasonable to infer that PEC suffered losses due to their independent dishonest conduct merely because they asserted their Fifth Amendment rights at a deposition.

Resolving all ambiguities and drawing all inferences in plaintiff's favor, one could reasonably conclude from this evidence that Gillmore, Gussow, Messer and Rose Felzenberg did not merely assist Robert and Barbara Felzenberg in their scheme to loot PEC, but rather independently caused PEC losses by engaging in their own dishonest conduct. Thus, genuine factual issues exist with regard to whether Gillmore, Messer, Gussow, and Rose Felzenberg were PEC employees that caused losses covered by the Aetna Policy. Aetna's motion for summary judgment must therefore be denied with regard to plaintiff's claims regarding PEC losses caused by these individuals. However, because there is no evidence that PEC suffered any losses due to the dishonest conduct of Alicia and Emily Felzenberg, plaintiff's claims regarding PEC losses caused by them must be dismissed.

### D. Plaintiff's Bad Faith Claims against LEU

The required elements of plaintiff's surviving bad faith claim against LEU were recently summarized in *Polizzi Meats, Inc. v. Aetna Life & Casualty Co.*, 931 F.Supp. 328 (D.N.J.1996):

[T]he New Jersey Supreme Court has recently recognized a cause of action for consequential damages based on an insurer's bad faith failure to pay a first-party claim. [*See Pickett v. Lloyd's*, 131 N.J. 457, 461, 621 A.2d 445 (1993).] In order to recover damages in excess of the policy limits the plaintiff must show (1) that the insurer was without even a "debatably valid" reason for its failure to pay; and, (2) that the insured's consequential damages were "clearly within the contemplation of the insurance company." . . . . **In order to impose "bad faith" liability, the insured must demonstrate that "no debatable reasons existed for denial of the benefits**

**available under the policy."** [*Id.* at 481, 621 A.2d 445].

*Id.* at 334 (emphasis added). *Pickett* also established the following rule: "Under the 'fairly debatable' standard, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad faith refusal to pay the claim." *Pickett*, 131 N.J. at 473, 621 A.2d 445. *See also Polizzi*, 931 F.Supp. at 334 (applying same rule). Plaintiff has failed to establish that it is entitled to coverage under the LEU Policies, and LEU has established that its policies were void *ab initio*. It therefore follows inexorably under the *Pickett* rule that plaintiff's bad faith claim against LEU must be dismissed pursuant to Rule 56.

Plaintiff now attempts to evade the *Pickett* bad faith standard by citing an unpublished New Jersey trial court decision, *Princeton Gamma–Tech. Inc. v. Hartford Ins. Co.*, No. SOM–L–1289–91 (N.J.Super.Ct.Law Div. Somerset Co. June 5, 1997), for the proposition that an insured's bad faith claim may also rest on the insurer's failure to conduct an adequate factual investigation of the insured's claims. This argument fails for at least two reasons. First, plaintiff's asserted interpretation of *Princeton Gamma–Tech, Inc.* conflicts with the New Jersey Supreme Court's decision in *Pickett*. In such a situation, I am bound to follow the law as established by the highest state court, not a more recent but conflicting interpretation by a trial court.

More importantly, however, LEU has produced a Declaration of Richard Foulger, claims person for leading London Excess Underwriter, (the "Foulger Decl."), dated September 1, 1997, in which Foulger details the attempts made by LEU to investigate PEC's claims. Plaintiff has produced no evidence whatever to contradict Foulger's assertion that LEU conducted a reasonably thorough investigation of PEC's claims under the circumstances. Accordingly, LEU's motion for summary judgment of plaintiff's bad faith claims must be granted.

## V. Conclusion

For the foregoing reasons, I find that: (1) New Jersey law applies to plaintiff's breach of contract claims; (2) PEC's response to questions 10 and 36 on the LEU application render the LEU Policies void *ab initio*, and accordingly LEU's motion for summary judgment must be granted; (3) Plaintiff's cross-motion for summary judgment must be denied; (4) Aetna's motion for summary judgment must be granted with regard to plaintiff's claims based on PEC losses caused by Robert Felzenberg, Barbara Felzenberg, Alicia Felzenberg and Emily Felzenberg; and (5) Aetna's motion for summary judgment must be denied with regard to plaintiff's claims based on PEC losses caused by the dishonest conduct of Gillmore, Messer, Robert Gussow, and Rose Felzenberg.

SO ORDERED.