USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 93-1363 ALLAN S. BIRD, ETC. Plaintiff, Appellant, v. CENTENNIAL INSURANCE COMPANY, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Walter Jay Skinner, Senior U.S. District Judge] __________________________ ____________________ Before Torruella and Stahl, Circuit Judges, ______________ and DiClerico,* U.S. District Judge. ___________________ ____________________ Robert B. Carpenter, with whom Louis J. Scerra, Jr., Donnalyn B. ___________________ ____________________ ____________ L. Kahn, and Goldstein & Manello, P.C., were on brief for appellant. _______ _________________________ George C. Rockas, with whom Paul R. Devin and Peabody & Arnold, _________________ ______________ ________________ were on brief for appellee. ____________________ December 1, 1993 ____________________ ____________________ *Of the District of New Hampshire, sitting by designation. STAHL, Circuit Judge. In this appeal, plaintiff- ______________ appellant Allan S. Bird challenges the district court's entry of summary judgment against him and in favor of defendant- appellee Centennial Insurance Company on his claim that defendant breached two fidelity insurance policies ("the Policies"). After careful consideration of plaintiff's arguments, we affirm. I. I. __ BACKGROUND BACKGROUND __________ Plaintiff is the general partner of fifteen limited partnerships that own and operate residential multi-family housing projects throughout the United States. The projects are subsidized to varying degrees by the United States Department of Housing and Urban Development ("HUD"). To assist in the operation of the projects, the partnerships had entered into certain management agreements with Capital Site Management Company ("Capital") and/or Asset Management Corporation ("Asset"). Capital managed all of the projects until September 1987, at which time it became inactive. The agreements were then taken over by Asset, which can fairly be described as the corporate reincarnation of Capital. John Panagako was the president and treasurer of Capital and owned 50% of the company's stock. Panagako's wife, Janice Panagako, owned the other 50%. John and Janice Panagako were also the only directors of Capital; however, -2- 2 Janice Panagako's duties were clerical and secretarial in nature. No formal directors' meetings were ever held. Asset's structure was identical to Capital's except for the fact that John Panagako was Asset's sole shareholder. It is clear from the record that John Panagako had complete control over both of these corporations. Each of the management agreements contained a provision requiring the managing agent, i.e., Capital or Asset, to procure fidelity insurance to protect against loss due to fraudulent or dishonest acts committed by its employees. In relevant part, the provision states: 19. Fidelity Bond. The Agent will _____________________ furnish, at his [sic] own expense, a fidality [sic] bond in the principal sum of at least an amount equal to the [project's] gross potential income for two months and is [sic] conditioned to ___ __ ___________ __ protect the Owner and [the Secretary of _______ ___ _____ ___ ___ _________ __ HUD and the mortgagee] against ___ ___ ___ _________ misapplication of project funds by the Agent and its employees.1 ____________________ 1. Plaintiff contends that the inclusion of this provision was mandated by HUD "regulations." However, the record does not reflect, and we cannot locate, any HUD regulation which __________ affirmatively requires managing agents of HUD-subsidized properties to purchase fidelity bonds. Rather, it appears that plaintiff's argument is premised upon (1) a provision of the HUD Handbook, 4381.5 REV-1, which requires property managers to obtain fidelity coverage for both principals of the management entity and "all persons who participate directly or indirectly in the management and maintenance of the project and its assets, accounts and records"; and (2) the affidavit of G. Richard Dunnells, former Deputy Assistant Secretary for Housing Management at HUD, which states that the aforementioned Handbook provision was promulgated in response to 24 C.F.R. 207.10, which requires the mortgagor of HUD-insured properties "to keep the property insured by a -3- 3 (Emphasis supplied). Apparently in response to this provision, Capital and Asset secured from defendant the Policies at issue in this litigation. In relevant part, the Policies provided coverage for the "[l]oss of money, securities and other property which the insured shall sustain . . . through any fraudulent or dishonest act or acts committed by any of the employees acting alone or in __ ___ __ ___ _________ collusion with others." (Emphasis supplied). The term "employee" was then, in relevant part, defined as follows: [A]ny natural person (except a director or trustee of the insured, if a corporation, who is not also an officer or employee thereof in some other capacity) while in the regular service of the insured in the ordinary course of the insured's business during the Effective Period of this insuring form and whom the ___ ____ ___ insured . . . has the right to govern and _______ ___ ___ _____ __ ______ ___ direct in the performance of such ______ __ ___ ___________ __ ____ service, but does not mean any broker, _______ factor, commission merchant, consignee, contractor or agent or other representative of the same general character. (Emphasis supplied). Importantly, however, despite the directives of paragraph 19 of the management agreements, (1) only Capital and Asset were named as insureds under the Policies, and (2) the terms of the Policies excluded from ____________________ standard policy or policies against fire and such other hazards as the Commissioner, upon the insurance of the mortgage, may stipulate." -4- 4 coverage misapplications by the managing agents, i.e., the insureds, themselves.2 By February 1989, plaintiff had become concerned that John Panagako was making improper payments from project funds. Accordingly, plaintiff terminated the management agreements. Subsequently, plaintiff filed a state court action against John Panagako, Capital, and Asset for breach of fiduciary duty, breach of contract, conversion, misrepresentation, fraud, money had and received, breach of the covenant of good faith and fair dealing, and violation of the Massachusetts Unfair Trade Practices statute. See Bird ___ ____ v. Capital Site Management Co., Civil No. 89-1713-C (Mass. ____________________________ Super. Ct. 1989). A jury verdict was returned in plaintiff's favor on all counts, and damages were ultimately assessed at nearly $1.2 million. In July 1990, plaintiff initiated the instant action in Massachusetts Superior Court, asserting that he was entitled to collect as a third-party beneficiary under the Policies. Defendant removed the case to the district court and subsequently moved for summary judgment, arguing that no coverage existed because plaintiff was not an insured under the Policies. Thereafter, plaintiff obtained an assignment ____________________ 2. Specifically, Exclusion A of the Policies provided: "This insuring form does not apply . . . to loss due to any fraudulent, dishonest or criminal act by any insured or a partner therein, whether acting alone or in collusion with others . . . ." -5- 5 of all the right, title, and interest of Capital and Asset in the Policies, and moved for leave to file an amended complaint so as to jettison his third-party beneficiary theory and assert in its place an entitlement to coverage as a direct beneficiary under the Policies. The motion for leave to file the amended complaint was allowed. In January 1992, defendant filed a second motion for summary judgment, arguing primarily that plaintiff could not collect under the Policies because the fraudulent and dishonest acts giving rise to the claim were not committed by an "employee" of the insureds, but instead were committed by the insureds' "alter ego."3 Plaintiff opposed the motion, arguing inter alia, that defendant should be estopped from _____ ____ denying coverage under the policies. He also filed a conditional motion, pursuant to Fed. R. Civ. P. 56(f),4 for ____________________ 3. We use the term "alter ego" as a shorthand way of identifying any natural person whom the corporate insured does not have "the right to govern and direct in the performance of [his/her] service." As noted previously, under the terms of the Policies, such an alter ego is not considered an employee of the corporate insured. And, because the Policies only cover fraudulent or dishonest acts by employees of the corporate insureds, fraudulent or dishonest acts by an alter ego of the insureds are outside the scope of coverage. 4. Rule 56(f) provides: When Affidavits are Unavailable. Should it When Affidavits are Unavailable. appear from the affidavits of a party opposing the [Rule 56] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a -6- 6 further discovery relevant to his newly-raised estoppel argument. In February 1993, the district court issued a memorandum and order granting defendant's second motion for summary judgment. In so doing, the court held that John Panagako was not an employee of the insureds, and that the Policies therefore did not cover his fraudulent and/or dishonest acts. See supra note 3. It also rejected ___ _____ plaintiff's estoppel argument, reasoning that the doctrine of "unclean hands" barred any recovery by plaintiff. Finally, the court denied plaintiff's Rule 56(f) motion. It is from these decisions that plaintiff appeals. II. II. ___ SUMMARY JUDGMENT STANDARD SUMMARY JUDGMENT STANDARD _________________________ Summary judgment permits a court to "`pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Santiago v. Sherwin Williams Co., 3 F.3d 546, 548 (1st Cir. ________ _____________________ 1993) (quoting Wynne v. Tufts Univ. Sch. of Medicine, 976 _____ ______________________________ F.2d 791, 794 (1st Cir. 1992), cert. denied, 113 S. Ct. 1845 _____ ______ (1993)). It must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the ____________________ continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just. -7- 7 moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Our review of the allowance of a summary judgment motion is plenary. Levy v. FDIC, No. 92- ____ ____ 2135, slip op. at 6 (1st Cir. Oct. 19, 1993). It is against this backdrop that we evaluate plaintiff's contentions. III. III. ____ DISCUSSION5 DISCUSSION5 ___________ Plaintiff essentially makes three arguments on appeal: (1) that the district court erred in concluding, as a matter of law, that the fraudulent and dishonest acts giving rise to plaintiff's claim were not committed by an employee of the insureds, but instead were committed by the insureds' alter ego; (2) that the court erred in rejecting his claim that defendant should, as a matter of law, be estopped from denying coverage under the Policies; and (3) that the court erred in denying his alternative Rule 56(f) motion for additional discovery on the issue of estoppel. We discuss each argument in turn. A. Was John Panagako an Employee of Capital and Allied A. Was John Panagako an Employee of Capital and Allied ________________________________________________________ or was he their Alter Ego? or was he their Alter Ego? __________________________ ____________________ 5. Because the parties agree that Massachusetts law governs this dispute, and because there is at least a "reasonable relation" between the dispute and the forum whose law has been selected by the parties, we will forego an independent analysis of the choice-of-law issue and apply Massachusetts law. See Commercial Union Ins. Co. v. Walbrook Ins. Co., ___ __________________________ ___________________ Ltd., No. 92-2415, slip op. at 2, n.1 (1st Cir. Sept. 28, ____ 1993). -8- 8 The bulk of plaintiff's brief is directed at attacking the district court's ruling that Panagako was an alter ego, and not an employee, of the corporate insureds. The attack primarily is carried out on two fronts. First, accepting the district court's conclusion that the definition of the term "employee" is unambiguous, plaintiff argues that the court erred in concluding that John Panagako fell outside the definition's boundaries. Second, and alternatively, plaintiff argues that the definition of the term employee is ambiguous, and that this ambiguity must be resolved in his favor under Massachusetts law. E.g., Massachusetts Bay ____ _________________ Transp. Auth. v. Allianz Ins. Co., Inc., 597 N.E.2d 439, 441 _____________ _______________________ (Mass. 1992).6 We disagree with both of plaintiff's positions. 1. Plaintiff's First Argument 1. Plaintiff's First Argument ______________________________ In addressing plaintiff's first argument, that the Policies unambiguously provide coverage for the fraudulent and/or dishonest acts committed by John Panagako, we begin ____________________ 6. Relying on a series of cases regarding corporate "veil piercing," and defining the "alter ego defense" here at issue as the mere defensive application of this veil piercing doctrine, plaintiff also devotes several pages of his brief to arguing that Massachusetts courts would not recognize the defense. Plaintiff's argument in this regard is fundamentally flawed. The alter ego defense asserted by defendant is not a common law defense; rather, it is a ___ defense derived from the language of the Policies themselves. ___ ________ __ ___ ________ __________ As such, the common law tort cases relied upon by plaintiff in his reverse veil piercing argument are inapposite to the contract dispute before us. -9- 9 with some general ground rules for interpreting insurance contracts. The construction of language in an insurance contract is a legal determination, see J.I. Corp. v. Federal ___ __________ _______ Ins. Co., 920 F.2d 118, 119 (1st Cir. 1990) (collecting _________ Massachusetts cases), which we review de novo, see Falmouth __ ____ ___ ________ Nat'l Bank v. Ticor Title Ins. Co., 920 F.2d 1058, 1061 (1st __________ ____________________ Cir. 1990). Where there is no ambiguity in the language at issue, we will interpret it "according to the ordinary meaning of the words contained in its provisions." J.I. ____ Corp., 920 F.2d at 119. The language of a contract is _____ considered ambiguous only if its terms "are fairly susceptible to more than one construction." Id. ___ Where the intention of the parties as to who are employees is expressed in a fidelity policy, that intention will be given effect. See 13 Ronald A. Anderson and Mark S. ___ Rhodes, Couch on Insurance 2d, 46:25 at 33 (1982). Here, ______________________ the parties agreed that, inter alia, only those natural _____ ____ persons "whom the insured . . . has the right to govern and direct in the performance of [their] service" would be "employees" covered by the Policies. Thus, if John Panagako was not subject to governance and direction by Capital and/or Allied, he was not an employee of the insureds as that term is defined by the Policies. As we have said, the record clearly reveals that John Panagako was not subject to governance and direction by -10- 10 Capital or Allied, in that he was in complete control of both corporations. He owned 50% of Capital's and 100% of Allied's stock and was the president and treasurer of both corporations. He and his wife Janice, whose duties were clerical and secretarial in nature, were the only two directors of the corporations. No formal directors' meetings were ever held. Indeed, plaintiff does not dispute the fact that John Panagako was in complete control of Capital and Allied. Instead, he premises his challenge to the district court's determination that Panagako was not an employee upon two contentions: (1) that the corporations had the theoretical right to govern and direct Panagako, making him an employee under the terms of the Policies; and (2) that "the right to govern and direct language was merely intended to distinguish those persons within the corporation[s] whose acts are not covered by the Policies (i.e., employees) from those persons outside of the corporation[s] whose acts are not covered by the Policies (i.e., independent contractors and the like)." With respect to plaintiff's first contention, we join those courts that have passed on the issue and reject the claim that the theoretical right to govern and direct a dominant corporate actor is sufficient to render that actor an employee under the definition of employee set forth in the Policies. See Employer's Admin. Servs., Inc. v. Hartford ___ ________________________________ ________ -11- 11 Accident and Indem. Co., 709 P.2d 559, 562-63 (Ariz. App. ________________________ 1985); Kerr v. Aetna Casualty & Surety Co., 350 F.2d 146, ____ _____________________________ 154-55 (4th Cir. 1965); see also, e.g., Matter of World ___ ____ ____ ________________ Hospitality Ltd., 983 F.2d 650, 651-53 (5th Cir. 1993) _________________ (interpreting identical "right to govern and direct" language in a fidelity policy as excluding from the definition of employee a majority shareholder who dominated his corporation); California Union Ins. v. American Diversified ______________________ ____________________ Sav. Bank, 948 F.2d 556, 566 (9th Cir. 1991) (same); Three _________ _____ Garden Village Ltd. Partnership v. United States Fidelity & ________________________________ _________________________ Guar. Co., 567 A.2d 85, 90-92 (Md. 1989) (same). We think it _________ apparent that the "right" to govern and direct referred to in the Policies must be more than an ephemeral right inhering generally in the corporate form; rather, it must have some grounding in reality. Cf. Kerr, 350 F.2d at 154 (describing ___ ____ corporation's "right," under circumstances similar to those presented here, as "unrealistic" and "theoretical"). In this case, the argument that Capital and Allied had the right to govern and direct John Panagako lacks any credible basis. Accordingly, we do not accept it. Cf. J.I. Corp., 920 F.2d ___ __________ at 119 (insurance contracts should be construed according to the "`fair and reasonable meaning of the words in which the ____ __________ agreement of the parties is expressed'") (emphasis supplied) -12- 12 (quoting Cody v. Connecticut Gen. Life Ins. Co., 439 N.E.2d ____ ______________________________ 234, 237 (Mass. 1986)).7 With respect to plaintiff's second contention, we think it sufficient to state that the interpretation plaintiff would have us ascribe to the "right to govern and direct" language in the Policies is tortured to the point of absurdity. It is obvious that this language, far from being included merely to distinguish employees from those non- employee actors specified in the Policies, materially limits the definition of the term "employee" to those persons over whom the corporate insureds have control. Accordingly, we so ____________________ 7. Our conclusion also is supported by policy considerations. As the Fifth Circuit has observed: A corporation can only act through its officers and directors. When one person owns a controlling interest in the corporation and dominates the corporation's actions, his acts are the corporation's acts. Allowing the corporation to recover for the owner's fraudulent or dishonest conduct would essentially allow the corporation to recover for its own fraudulent or dishonest acts. The [fidelity] bonds, however, were clearly designed to insure the corporations against their employee's [sic] dishonest acts and not their own dishonest acts. Matter of World Hospitality, 983 F.2d at 652 (citing _______________________________ California Union Ins., 948 F.2d at 566). The fact that ______________________ plaintiff, and not the insureds, is seeking coverage under the Policies does not diminish the force of these considerations in this case, for plaintiff is pressing his claim as an assignee. As such, his rights under the Policies are limited to those of the assignors. See 17 Couch on ___ _________ Insurance 2d, 63A:267 at 146 (1983) ("It must be recognized ____________ that the assignee can receive no greater rights than those of the assignor."). -13- 13 read it. Cf. Plymouth Rubber Co. Inc. v. Insurance Co. of N. ___ ________________________ ___________________ Am., 465 N.E.2d 1234, 1238 (Mass. App. 1984) (declining to ___ "torture" the meaning of a clause in an insurance contract where it was understandable in its "usual and ordinary sense") (citation omitted). 2. Plaintiff's Second Argument 2. Plaintiff's Second Argument _______________________________ Plaintiff's second and alternative argument, that the definition of the term "employee" is ambiguous and that this ambiguity must be resolved in his favor, requires little discussion. In making his alternative argument, plaintiff does not explain how the definition of the term might be ambiguous. Nor does he make any attempt either to distinguish or to disagree with the several cases which have treated this very definition as unambiguous. See, e.g., ___ ____ Matter of World Hospitality, 983 F.2d at 651-53; California ____________________________ __________ Union Ins., 948 F.2d at 566-67; Three Garden Village, 567 ___________ _____________________ A.2d at 90-92; Employer's Admin. Servs., 709 P.2d at 562. _________________________ Accordingly, his argument being perfunctory, we deem it waived. See United States v. Innamorati, 996 F.2d 456, 468 ___ _____________ __________ (1st Cir.) (issues adverted to in a perfunctory manner and without developed argumentation deemed waived on appeal), cert. denied, 62 U.S.L.W. 3320 (Nov. 2, 1993).8 _____ ______ ____________________ 8. In that section of his brief where plaintiff perfunctorily asserts that the terms "employee" and "insured," see infra note 9, are ambiguous, he also seeks to ___ _____ introduce extrinsic evidence that the Policies at issue were mandated by HUD "regulations," but see supra note 1. In so ___ ___ _____ -14- 14 In sum, we reject plaintiff's challenge to the district court's determination that John Panagako was not an employee, but rather was an alter ego, of the insureds.9 B. Should Defendant be Estopped from Denying Coverage B. Should Defendant be Estopped from Denying Coverage ________________________________________________________ Under the Policies? Under the Policies? ___________________ Plaintiff's second argument, that the district court erred in refusing, as a matter of law, to hold defendant estopped from denying coverage, is based upon his claim that defendant knew of Capital's and Allied's corporate structures at the time the Policies were issued. See ___ Fidelity and Deposit Co. v. USAFORM Hail Pool, Inc., 318 F. _________________________ ________________________ Supp. 1301, 1305, 1308-09 (M.D. Fla. 1970) (insurer estopped from asserting alter ego defense where, inter alia, it (1) _____ ____ stipulated that the dominant shareholder was an employee ____________________ doing, he asserts that this fact will help to enlighten us as to the meaning of these purportedly ambiguous terms. See ___ Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, _______________ __________________________ 586 (1st Cir. 1993) (extrinsic evidence admissible to clarify ambiguous contractual provisions). Even if we were to assume arguendo the truth of ________ plaintiff's assertion, we do not see how such fact would tend to clarify anything at issue in this litigation. At most, the "regulations" to which plaintiff draws our attention tend to reinforce the perception that the Policies were not written in accordance with the specifications of HUD and paragraph 19 of the management agreements. They do not, ___ however, shed light on what the parties intended when they included the disputed terms in the Policies. 9. Because we so rule, we need not reach defendant's other proffered basis for affirmance, i.e., that Exclusion A, see ___ supra note 2, is applicable because John Panagako, as the _____ alter ego of Capital and Allied, was an "insured" under the terms of the Policies. Nor, obviously, need we discuss plaintiff's cursory argument that the meaning of the term "insured" in Exclusion A is ambiguous. -15- 15 under the fidelity bond, and (2) "knew everything" about the insured's operation), affirmed in part, vacated in part, 463 ________ __ ____ _______ __ ____ F.2d 4 (5th Cir. 1972). While we think that the USAFORM case _______ is easily distinguishable from the present situation, we believe that plaintiff's estoppel claim founders for an even simpler reason. As the district court noted, because plaintiff is proceeding as the assignee of Capital's and Allied's rights under the Policies, he is subject to any defenses that defendant could have interposed against Capital and Allied, the assignors. See Great Am. Ins. Co. v. United ___ __________________ ______ States, 575 F.2d 1031, 1034 (2d Cir. 1978). One defense to ______ the equitable claim of estoppel is the doctrine of "unclean hands." See Peabody Gas & Oil Co. v. Standard Oil Co., 187 ___ _____________________ ________________ N.E. 112, 113 (Mass. 1933) ("[O]ne must come into a court of equity with clean hands in order to secure relief . . . ."). Here, Capital and Allied were adjudged liable for the fraudulent and/or dishonest actions underlying this suit. As such, the district court correctly ruled that any claim of estoppel they might have asserted against defendant would have failed because of their unclean hands. Plaintiff, as their assignee, is therefore subject to the same fate. Accordingly, we reject plaintiff's challenge to the district court's refusal to hold defendant estopped from denying coverage. C. Should Plaintiff's Rule 56(f) Motion Have Been C. Should Plaintiff's Rule 56(f) Motion Have Been ________________________________________________________ Granted? Granted? ________ -16- 16 Finally, plaintiff contends that the court erred in denying his Rule 56(f) motion for additional discovery on the issue of estoppel. Once again, his argument is without merit. Rule 56(f) offers an "`escape hatch'" to a party opposing a summary judgment motion who "genuinely requires additional time to marshal `facts essential to justify its opposition.'" Mattoon v. City of Pittsfield, 980 F.2d 1, 7 _______ __________________ (1st Cir. 1992) (quoting Paterson-Leitch Co. v. Massachusetts ___________________ _____________ Mun. Wholesale Elec. Co., 840 F.2d 985, 988 (1st Cir. 1988)). ________________________ Under Rule 56(f), the movant is required (1) to articulate a plausible basis for its belief that the requested discovery would raise a trialworthy issue, and (2) to demonstrate good cause for failing to have conducted the discovery earlier. Mattoon, 980 F.2d at 7. Our review of an order denying _______ relief under Rule 56(f) is only for an abuse of discretion. Id. ___ As we have stated, plaintiff's estoppel argument is doomed by the fact that, as an assignee, plaintiff is subject to defendant's unclean hands defense. Moreover, the record reveals that this defense must prevail as a matter of law. It therefore follows that there is no need for discovery on the issue of estoppel. Accordingly, the district court did not abuse its discretion in denying plaintiff's Rule 56(f) motion. -17- 17 IV. IV. ___ CONCLUSION CONCLUSION __________ For the reasons herein stated, the district court did not err in granting defendant's second motion for summary judgment and denying plaintiff's Rule 56(f) motion for additional discovery. Affirmed. Costs to appellee. Affirmed. _________ -18- 18