**EAST ATTUCKS COMMUNITY HOUSING, INC., as Assignee of Omega Realty Company, Inc., Appellant,**

v.

**OLD REPUBLIC SURETY COMPANY and Reliance Insurance Company, Respondents.**

No. WD 61142.

Missouri Court of Appeals, Western District.

June 24, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 29, 2003.

Application for Transfer Denied Sept. 30, 2003.

Don A. Peterson, Kansas City, MO, for Appellant.

Bernard L. Balkin, Kansas City, MO, for Respondents.

Before EDWIN H. SMITH, P.J., and BRECKENRIDGE and SMART, JJ.

EDWIN H. SMITH, Presiding Judge.

East Attucks Community Housing, Inc. (EACH), appeals the summary judgment of the Circuit Court of Jackson County for the respondents, Old Republic Surety Company (Old Republic) and Reliance Insurance Company (Reliance), on EACH's claims, as a beneficiary and an assignee, for recovery under the fidelity bond policies issued by the respondents to Omega Realty Management Company, Inc. (Omega). The bond policies were purchased to indemnify the insured, Omega, against theft, forgeries, and other defalcations committed by its employees in its management of a not-for-profit low-income housing project owned by EACH. EACH was seeking recovery under the policies for thefts by Tucson Redd, the president of Omega, and Robert Wilp, the comptroller.

EACH raises five points on appeal. In Point I, it claims that the trial court erred in granting summary judgment to the respondents on EACH's claim for recovery under the fidelity bond policies for the thefts from Omega allegedly committed by Redd on the basis that he was not a covered employee because the facts alleged in the respondents' motion, even if true, did not entitle them to judgment as a matter of law on that basis. As to EACH's remaining four points, it claims in each that the trial court erred in denying its motion for summary judgment on its claim as to Redd's alleged thefts.

We reverse and remand.

## Facts

EACH, a not-for-profit corporation organized and existing under the laws of the State of Missouri, owned a Housing and Urban Development (HUD) subsidized housing project known as Sycamore Groves, which was located in Kansas City, Missouri. On September 1, 1994, EACH entered into a management agreement with Omega, a property management company organized under the laws of the State of Missouri and specializing in HUD housing, to operate Sycamore Groves. The term of the agreement was for three years, to expire on August 31, 1997. The agreement was later extended through February 28, 1998.

Pursuant to the management agreement, Omega was to, *inter alia*, post "a fidelity bond in the principal sum of Eighty Thousand Dollars ($80,000.00), which is at least equal to the potential gross income for two months and is conditioned to protect the Owner [EACH] and the Mortgagee against misappropriation of Project funds by the Agent [Omega] and its employees." In satisfaction of its bond obligation under the management agreement, Omega purchased from Old Republic, a corporation organized under the laws of the State of Wisconsin and authorized to do business in the State of Missouri, a crime policy, Policy No. RCB445146, which was to be effective as of September 1, 1993. That policy provided employee dishonesty coverage for Omega in an amount up to $225,000. Omega later purchased from Reliance, a corporation organized under the laws of the Commonwealth of Pennsylvania and authorized to do business in the State of Missouri, a crime policy, Policy No. B2646708, which was effective January 18, 1996. It also provided employee dishonesty coverage, but only for $25,000, with a deductible of $1,000.

The Reliance bond was to cover the deductible of the Old Republic bond.

Except for the declarations pages, setting out the dates and amounts of the coverages and deductibles, the provisions of the Old Republic and Reliance policies were identical in form and content, with Omega being the only named insured in both policies. As to coverage, each policy provided that the insurer would "pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss," with "covered property" being defined as " '[m]oney', 'securities', and *property other than money and securities,*' " and "covered cause of loss" being defined as " '[e]mployee dishonesty.' " An "employee" was defined in the policies as: "[a]ny natural person: (1) While in your service (and for 30 days after termination of service); and (2) Whom you compensate directly by salary, wages or commissions; and (3) Whom you have the right to direct and control while performing services for you."

At all relevant times, Redd was the sole shareholder, president and managing officer, and a director of Omega. Redd's wife, Ramona, served as the secretary and as a director. As reflected by Omega's annual reports filed with the Missouri Secretary of State from 1995 through 1998, also serving as directors were Herman Johnson and William Threatt. Johnson and Threatt both sent letters resigning from the board effective February 4, 1997, and March 20, 1997, respectively. However, Johnson's letter was sent to an incorrect address.

Robert Wilp served as the comptroller of Omega from 1992 to 1995 and from March 1997 through the middle of 1998. Prior to returning to Omega in 1997, Wilp advised Redd that he was charged sometime in 1996 with a felony for stealing money while he was employed at Papa John's.

In 1996 and 1997, Redd stole a total of $55,526.50 from the tenant security deposit account Omega maintained for EACH. In that regard, three checks, Nos. 1449, 1201, and 9742, were written by Redd on the account, one on September 6, 1996, for $40,000, one on November 4, 1997, for $7,000, and one on December 4, 1997, for $8,526.50. Redd used the money he took to cover up his embezzlement from the employee 940 income withholding tax funds that Omega had withheld from employee wages. These trust funds and the tax obligations for which they were created to pay were those of both Omega and Redd. Wilp was aware of the thefts by Redd and assisted him in trying to cover them up.

Wilp was also stealing from EACH's accounts. From September 1997 through December 1997, he forged checks totaling $13,940. The money was being used to fund his drug habit. As a result of their thefts, both Redd and Wilp were indicted for, pled guilty to, and were convicted of mail fraud, conspiracy to commit mail fraud and money laundering in the United States District Court, Western District of Missouri.

On August 31, 1998, Omega assigned to EACH its claims against the Old Republic policy for the thefts of Redd and Wilp. On January 6, 1999, EACH, as Omega's assignee, filed a proof of loss with Old Republic. In a letter of January 20, 1999, to counsel for EACH, acknowledging the receipt of EACH's proof of loss as to the thefts, counsel for Old Republic, Bernard L. Balkin of the law firm, Sandler, Balkin, Hellman, Weinstein & Witten, P.C., requested EACH to produce Redd for examination concerning the loss claim. On February 1, 1999, counsel for Old Republic wrote to the attorney representing Redd in his criminal proceeding, requesting that Redd execute a waiver, waiving any con-

flict of interest that Balkin's law firm may have had in representing Old Republic against Omega as a result of a member of the firm having previously represented Omega and Redd in an unrelated matter. The waiver was ultimately signed on May 18, 2000, after suit had been filed by EACH against the respondents.

On February 4, 1999, counsel for EACH wrote counsel for Old Republic advising that she was unable to locate Redd to set a date for his examination. In response, counsel for Old Republic wrote to counsel for EACH acknowledging the receipt of her letter of February 4 and advising:

I will await further information from you concerning the available times and places for Mr. Redd's examination.

As I explained to you in our earlier correspondence and conversations, we cannot proceed with an adequate investigation of this claim without such an examination. Although we are willing to wait a reasonable time for you to locate Mr. Redd and arrange for his appearance, we wish to again caution you that our action should not be in any way construed to be a waiver of any of the terms, stipulations or contingencies of the concerned bond, nor any agreement to extend the time provisions for filing the proof of loss or for waiving of the notice provisions in the concerned bond.

In a March 9, 1999, letter from counsel for Old Republic to counsel for EACH, EACH was advised that it had until April 1, 1999, to produce Redd or counsel for Old Republic would recommend to his client that "it close its file on this matter by reason of a failure of proof on the part of its insured" and reiterated his stance that the extension to produce Redd should not be taken as a waiver of the policy provisions concerning proof of loss.

On November 12, 1999, Omega assigned to EACH its claims against the Reliance

policy for Redd and Wilp's thefts. EACH then filed a proof of loss with Reliance on May 6, 1999. Counsel for Reliance, which was the same as counsel for Old Republic, acknowledged receipt of the proof of loss claim in a letter of May 18, 1999.

In a letter dated June 7, 1999, Reliance advised counsel for EACH that its claim was being denied for failure to produce Redd for examination. In a letter dated June 10, Old Republic did the same.

On April 17, 2000, EACH filed separate lawsuits against the respondents in the Circuit Court of Jackson County seeking, as Omega's assignee, to recover under the Old Republic and Reliance policies for the thefts by Redd and Wilp. In addition to seeking recovery of its claimed losses resulting from the thefts, EACH also sought damages for vexatious refusal to pay. On February 21, 2000, the two cases were ordered consolidated for trial.

On August 20, 2001, the respondents filed a joint motion for summary judgment and suggestions in support thereof. The respondents claimed on several alternative bases that on the undisputed facts alleged, there was no coverage for the losses claimed by EACH and that EACH had breached its duties with respect to reporting its losses and cooperating with the respondents in their investigation of the same, all as required under the policies. On November 5, 2001, EACH filed its response to the respondents' motion and a motion for summary judgment. The respondents filed their response to EACH's motion on January 3, 2002. The trial court sustained the respondents' motion for summary judgment on January 29, 2002, and overruled EACH's.

This appeal follows.

### Standard of Review

In reviewing the grant of summary judgment:

[o]ur review is essentially *de novo*. The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially. The propriety of summary judgment is purely an issue of law. As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment.

*ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. *banc* 1993) (citations omitted). Summary judgment will be upheld on appeal if: (1) there is no genuine dispute of material fact, and (2) the movant is entitled to judgment as a matter of law. *Id.* at 380.

When considering appeals from summary judgments, the [c]ourt will review the record in the light most favorable to the party against whom judgment was entered. Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. We accord the non-movant the benefit of all reasonable inferences from the record.

*Id.* at 376 (citations omitted).

### I.

In Point I, EACH claims that the trial court erred in granting summary judgment to the respondents on EACH's claim for recovery under the fidelity bond policies for the thefts from Omega allegedly committed by Redd on the basis that he was not a covered employee because the facts alleged in the respondents' motion, even if true, did not entitle them to judgment as a matter of law on that basis. Specifically, EACH claims that the respon-

dents failed to plead undisputed facts establishing that Redd was not, by policy definition, an "employee" covered under the terms of the bond policies. In their motion, the respondents contended that Redd was not an employee of Omega, but was its "alter ego," in that he was not subject to Omega's direction and control.

■ To be entitled to summary judgment under Rule 74.04,[1] the movant must demonstrate that: (1) there is no genuine dispute as to the material facts on which the movant relies for summary judgment; and (2) based on those undisputed facts, the movant is entitled to judgment as a matter of law. *ITT Commercial Fin.,* 854 S.W.2d at 380. If the movant is the defending party, as is the case here, the movant can make a *prima facie* case for summary judgment by one or more of three means: (1) showing facts that negate any one of the claimant's elements of proof; (2) showing that the claimant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's proof elements; or, (3) showing that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly pleaded affirmative defense. *Id.* at 381. "Regardless of which of these three means is employed by the 'defending party,' each establishes a right to judgment as a matter of law." *Id.*

■ EACH sought recovery under the bond policies as an assignee of the insured, Omega. As an assignee, EACH possessed no greater rights to recover under the policies than Omega. *Freeman v. Leader Nat'l Ins. Co.,* 58 S.W.3d 590, 597 (Mo.

App.2001). Thus, inasmuch as there is no dispute that EACH was Omega's assignee under both the Old Republic and Reliance policies, to recover for the alleged thefts of Redd under those policies, EACH was required to prove: (1) the issuance and delivery of the policies to Omega; (2) that the policies were in effect at the time of loss; (3) the claimed loss for Redd's alleged thefts from Omega was a covered loss under the policies; and (4) that there was notice and proof of loss to the respondents. *Valentine–Radford, Inc. v. Am. Motorists Ins. Co.,* 990 S.W.2d 47, 51 (Mo.App.1999). In the respondents' motion for summary judgment, they employed the first means available to a defending party for making a *prima facie* case for summary judgment by alleging facts, which, if true, would negate on alternative bases the second, third, and fourth proof elements of EACH's claims for recovery under the bond policies for the alleged thefts of Redd.

■ Before discussing the merits of EACH's claim of error in this point, we first would note that it only addresses the trial court's grant of summary judgment as to the loss claimed by EACH as the assignee of Omega for the thefts of Redd and not of Wilp, even though its cause of action asserted one claim under each policy for recovery in the total amount of the thefts committed by both. While at first blush this might seem procedurally insufficient to invoke our jurisdiction in that it only attacks a portion of the trial court's summary judgment, it is not. While it is true that a *full* summary judgment on a claim is a final judgment subject to appellate review, and a partial summary judgment is not, *Ashworth v. City of Moberly,* 53 S.W.3d 564, 571 (Mo.App.2001); *More-*

---

1. All rule references are to the Missouri Rules of Civil Procedure (2002), unless otherwise indicated.

*land v. Farren–Davis*, 995 S.W.2d 512, 517–18 (Mo.App.1999), the fact that EACH chose not to attack the summary judgment for the respondents on the Wilp thefts does not change the fact that the trial court granted a full summary judgment to the respondents on EACH's claim, encompassing Wilp's as well as Redd's thefts, such that there is a final judgment subject to our review. However, if, in fact, after conducting our review, we determine that summary judgment was not proper as to the Redd thefts, then we are left with a partial summary judgment for the respondents on the Wilp thefts. Partial summary judgments are not final judgments subject to appellate review such that our only recourse would be to reverse the full summary judgment of the trial court and remand the cause to it for further proceedings consistent with our opinion, without commenting one way or the other on the propriety of the trial court's granting summary judgment to the respondents as to the Wilp thefts. *Moreland*, 995 S.W.2d at 517. Of course, on the flip side, given the fact that summary judgment on the Wilp thefts is not challenged in this point, if we find that summary judgment was proper as to the Redd thefts, we would affirm without reviewing the propriety of summary judgment on the Wilp thefts.

In an attempt to negate the third proof element of EACH's claim, "a loss caused by a peril insured against," the respondents alleged in their motion that Redd's theft of $55,526.50 from Omega was not a covered loss because only dishonest actions of an "employee" of Omega were covered and Redd was not an "employee" as that term is defined in the bond policies. Specifically, they contended that by definition he was not an employee of Omega, but was, in fact, its "alter ego."

In the trial court's "ORDER/JUDGMENT" granting the respon-

dents' motion for summary judgment, the only basis given for the court's ruling was:

In Missouri the law is well settled in that as a matter of public policy one cannot insure himself from his own thefts, dishonest acts or intentionally inflicted damage. *Crull v. Gleb*, 382 S.W.2d 17 (Mo.App.1964). It would be a sham and a travesty to embrace the concept that even a purported assignee could benefit from the worngful [*sic*] acts of the assignor.

From the trial court's judgment, it is clear that it was sustaining the respondents' motion on the basis that Redd was not a covered employee of Omega, but was its alter ego such that it would be against public policy to allow Omega to insure against his unlawful acts in that they were essentially the acts of Omega. We would agree with the trial court that in Missouri, it is against public policy to allow one to insure against one's own thefts, dishonest acts or intentionally inflicted damage. *Purk v. Purk*, 817 S.W.2d 915, 917 (Mo. App.1991) (*citing Crull v. Gleb*, 382 S.W.2d 17, 23 (Mo.App.1964)). Nonetheless, inasmuch as coverage under a policy of insurance is a matter of contract, in determining whether Redd was a covered employee, we must first look to the language of the policies, rather than public policy. *Transport Indem. Co. v. Teter*, 575 S.W.2d 780, 784 (Mo.App.1978).

In interpreting an insurance contract, we are to read the contract as a whole and determine the intent of the parties, giving effect to that intent by enforcing the contract as written, unless to do so would violate public policy. *Kyte v. Am. Family Mut. Ins. Co.*, 92 S.W.3d 295, 298–99 (Mo.App.2002). In doing so, we are to give the language used in the insurance contract its plain and ordinary meaning. *Mansion Hills Condo. Ass'n v. Am. Family Mut. Ins. Co.*, 62 S.W.3d 633, 638 (Mo.

App.2001). If giving the language used its plain and ordinary meaning the intent of the parties is clear and unambiguous, we will not resort to rules of construction to interpret the contract. *Kyte,* 92 S.W.3d at 298. The mere fact that the parties disagree over the interpretation of the terms of a contract does not create an ambiguity. *Id.* at 299. "An ambiguity arises where there is a duplicity, indistinctness, or uncertainty in the meaning of the words used in an insurance contract." *Id.*

> Language is ambiguous if it is reasonably open to different constructions and the language used will be viewed in the meaning that would ordinarily be understood by the layperson who bought and paid for the policy. Therefore, if an ambiguity exists, the language of the policy will be interpreted in the manner that would ordinarily be understood by the lay person who bought and paid for the policy.

*Lincoln County Ambulance v. Pac. Employers Ins.,* 15 S.W.3d 739, 743 (Mo.App. 1998). (Citations omitted.)

> If a term is specifically defined in an insurance policy, courts will normally look to that definition and nowhere else to determine its meaning. However, in order for the contract definition to necessarily control, the definition itself must be reasonably clear and unambiguous. Otherwise, an appellate court is free to give a reasonable construction to the term, applying general contract principles and resolving doubts in favor of the insured.

*Mansion Hills,* 62 S.W.3d at 638. (Citations omitted.)

The bond policies purchased by Omega from the respondents insured against loss resulting from "employee dishonesty" of Omega employees in managing and operating Sycamore Groves. An "employee" is defined in the policies as:

> a. Any natural person:
>
> (1) While in your [Omega's] service (and for 30 days after termination of service); and
>
> (2) Whom you compensate directly by salary, wages or commissions; and
>
> (3) Whom you have *the right to direct and control* while performing services for you.

(Emphasis added.) While there is no dispute that Redd was a "natural person" who met the first two definitional elements for being deemed an "employee" under the policies, the respondents alleged in their motion that he did not meet the third, that Omega had "the right to direct and control" him while he was performing services for Omega, such that he was not a covered employee, entitling them to summary judgment on that basis. Hence, to make a *prima facie* case for summary judgment on the basis that Redd was not a covered employee, as defined in the bond policies, the respondents had to have alleged, *inter alia,* facts in their motion, which when taken as true, would establish that Omega had no right to direct and control Redd's actions on its behalf.

The respondents contend that the "right to direct and control" language of the definition of employee found in the policies is unambiguous and expresses a clear intent to exclude Redd from coverage as an "alter ego" of Omega, citing several decisions from foreign jurisdictions, primarily relying on *Bird v. Centennial Insurance Co.,* 11 F.3d 228 (1st Cir.1993).[2] In *Bird,* the

---

**2.** *See also In re World Hospitality Ltd.,* 983 F.2d 650, 652 (5th Cir.1993); *California Union Ins. Co. v. Am. Diversified Sav. Bank,* 948 F.2d 556, 566 (9th Cir.1991); *Hartford Fire Ins. Co. v. Conestoga Title Ins. Co.,* 328 N.J.Super. 456, 746 A.2d 460, 461–62 (2000); *Transamerica Ins. Co. v. Fed. Deposit Ins. Corp.,* 489 N.W.2d 224, 227–28 (Minn.1992);

court was required to address the same issue that now confronts us here. There the lower court granted summary judgment to the insurer finding that the alleged employee was an "alter ego" of the corporate insureds, not an employee as that term was defined in the policies. *Id.* at 231. The language in the *Bird* policies defining employee was almost identical to the language in dispute in our case. Those policies defined employee as:

> any natural person (except a director or trustee of the insured, if a corporation, who is not also an officer or employee thereof in some other capacity), while in the regular service of the insured in the ordinary course of the insured's business during the Effective Period of this insure in form *and whom the insured ... has the right to govern and direct in the performance of such service,* but does not mean any broker, factor, commission merchant, consignee, contractor or agent or other representative of the same general character.

*Id.* at 230. In agreeing with the lower court that the alleged employee was not a covered employee as defined in the policies, the *Bird* court found that on the facts alleged, he "was not subject to governance and direction by [the corporate insureds], in that he was in complete control of both corporations." *Id.* at 232.

In holding as it did, the *Bird* court addressed the insureds' argument that the "alter ego defense" relied on by the insurer to deny coverage was not a defense that should be adopted by the State of Massachusetts based on an analysis of that state's law with respect to the doctrine of "corporate veil piercing." *Id.* at 232 n. 6. In that regard, the insureds argued that

the alter ego defense was a "mere defensive application" of the doctrine piercing the corporate veil or reverse veil piercing. *Id.* The *Bird* court rejected the insureds' argument, pointing out that the alter ego defense relied upon by the insurer was "*not* a common law defense; rather, it [was] a defense derived from *the language of the Policies themselves.*" *Id.* Likewise in our case, EACH argues against our adopting the alter ego defense based on public policy considerations. However, just as in *Bird,* if we find that the language of the policies defining a covered employee excludes an alter ego of the corporate insured, that language must be enforced, regardless, unless to do so would violate some overriding public policy of this state.

 While our appellate courts have not previously interpreted the "right to direct and control" language of the bond policies in question or similar language, they have dealt extensively with the concept of a corporate alter ego in the context of corporate veil piercing cases. The doctrine of piercing the corporate veil is employed to hold an individual personally liable for what are deemed vicarious acts of the corporation. *Dwyer v. ING Inv. Co., Inc.,* 889 S.W.2d 902, 904 (Mo.App.1994). The doctrine is predicated on the "alter ego" rule. *Saidawi v. Giovanni's Little Place, Inc.,* 987 S.W.2d 501, 504 (Mo.App. 1999). "Under the alter ego rule, when a corporation is so dominated by a person as to be a mere instrument of that person and is indistinct from the person controlling it, then the court will disregard the corporate form if to retain it would result in injustice." *Id.* at 504–05 (*quoting Edward D. Gevers Heating & Air Conditioning Co. v.*

*Three Garden Vill. Ltd. P'ship v. U.S. Fid. & Guar. Co.,* 318 Md. 98, 567 A.2d 85, 90–91 (1989); *Employer's Admin. Servs., Inc. v. Hartford Accident & Indem. Co.,* 147 Ariz.

202, 709 P.2d 559, 562–63 (App.1985); *Kerr v. Aetna Cas. & Sur. Co.,* 350 F.2d 146, 154–55 (4th Cir.1965).

*R. Webbe Corp.*, 885 S.W.2d 771, 773 (Mo. App.1994)). Logically, we see no reason why the alter ego rule cannot be used either as a sword in the context of "piercing the corporate veil," to allow recovery against a corporate alter ego for corporate acts, or as a shield in the context of "reverse piercing the corporate veil," to prevent recovery by a corporate insured under a fidelity bond policy for the acts of the corporate alter ego. Thus, the "right to direct and control" language of the policies in our case would seem to incorporate the alter ego rule, which in turn, would work to invoke the alter ego defense or exclusion in order to deny coverage to Omega for Redd's acts and, consequently, its assignee EACH.

■ The *Bird* court recognized that although its application of the alter ego defense to deny coverage was derived from the policy language defining a covered employee, its interpretation of that language was also supported by public policy considerations, recognizing that "[w]hen one person owns a controlling interest in the corporation and dominates the corporation's actions, his acts are the corporation's acts" such to "[allow] the corporation to recover for that person's fraudulent or dishonest conduct would essentially allow the corporation to recover for its own fraudulent or dishonest acts." *Bird*, 11 F.3d at 233 n. 7. Similarly, in Missouri, public policy dictates that one cannot insure against one's own thefts, dishonest acts, or intentionally inflicted damage. *Purk*, 817 S.W.2d at 917. This is the same public policy alluded to by the trial court in its order/judgment as a basis for sustaining the respondents' motion for summary judgment that a party cannot insure against that party's own unlawful acts. Given this public policy and the fact that the alter ego rule would logically apply in piercing the corporate veil or reverse piercing of the corporate

veil, the question remains open as to whether in the absence of the "right to direct and control" or similar language in a policy, an argument could be made that public policy alone would be sufficient to invoke the alter ego defense to prevent a corporate insured from recovering for the fraudulent or dishonest acts of its corporate alter ego. *See Halpin v. Am. Family Mut. Ins. Co.*, 823 S.W.2d 479, 483 (Mo. banc 1992) (recognizing that an insurance contract will generally be enforced as written, unless to do so would violate the law or public policy); *see also Interstate Agri Servs., Inc. v. Bank Midwest, N.A.*, 982 S.W.2d 796, 800 (Mo.App.1998). It should be noted, however, that for public policy to trump contract language that is clear and unambiguous, the "public policy must usually find support in necessary implication from statutory provisions." *Halpin*, 823 S.W.2d at 483.

■ EACH argues that if the policy language in question is going to be interpreted as evincing an intent to incorporate, in effect, the alter ego defense, it should be interpreted such that the defense would not be triggered where Omega retained a technical right to control and direct Redd's services, as opposed to the actual exercise of that right, focusing on the term "right" in the "right to direct and control" language. In that regard, EACH contends that there was a genuine dispute over whether Omega had a board of directors that, under Missouri law, had a right to control Redd's actions. This same argument was made and rejected in *Bird*. In rejecting that argument, the *Bird* court, citing to *Employer's Admin. Servs., Inc. v. Hartford Accident & Indem. Co.*, 147 Ariz. 202, 709 P.2d 559, 562–63 (1985) and *Kerr v. Aetna Casualty & Surety Co.*, 350 F.2d 146, 154–55 (4th Cir.1965), held: "We think it apparent that the 'right' to govern and direct referred to in the Policies must

be more than an ephemeral right inhering generally in the corporate form; rather, it must have some grounding in reality." *Bird,* 11 F.3d at 233. We agree.

At first blush, EACH's argument, that a mere technical right of the corporate insured to control and direct an individual's activities on behalf of the corporation is sufficient to avoid the invocation of the alter ego defense, would appear to have some merit. However, the phrase, "right to control and direct," cannot be read in isolation, but must be read in context. *J.H. Berra Constr. Co., Inc. v. Mo. Highway & Transp. Comm'n,* 14 S.W.3d 276, 279 (Mo. App.2000). There is no dispute that given the express terms of the policies, the policies were solely intended to indemnify Omega for the dishonest acts of its employees. They were not intended to protect Omega from its own acts, which applying the alter ego rule of this state, would include the acts of an alter ego. Thus, when read in context, we would agree with the *Bird* court that the reference to the "right to govern and direct" in the policies must mean something "more than an ephemeral right inhering generally in the corporate form; rather, it must have some grounding in reality." *Bird,* 11 F.3d at 233. Hence, we find that the policies in question do, in fact, incorporate the alter ego defense or exclusion.

■ EACH argues on equitable and public policy grounds that we should not "adopt" the alter ego defense asserted by the respondents, citing *Transamerica Insurance Co. v. Federal Deposit Insurance Corp.,* 489 N.W.2d 224 (Minn.1992). Of course, in applying, in effect, the alter ego defense, we are not *per se* adopting the defense, but are simply giving effect to the language of the insurance policies, as we must. In that regard, equitable concerns cannot work to defeat contractual provisions that do not otherwise violate the law or public policy. *Lutsky v. Blue Cross Hosp. Serv., Inc., of Mo.,* 695 S.W.2d 870, 881 (Mo. *banc* 1985). We must enforce contracts as written, unless to do so would violate the law or public policy. *Interstate Agri Services, Inc.,* 982 S.W.2d at 800. As to public policy working to defeat the alter ego exclusion provision of a policy, EACH contends, without citation to authority, that it is "repugnant to the terms and purposes of employee dishonesty policies." While it may be repugnant to EACH to exclude corporate alter egos from coverage under the policy language in question, it fails to educate us on how it would be repugnant as a matter of "public" policy such that the language of the policy should be ignored. Here, as we discussed, *supra,* rather than violating public policy, the alter ego defense promotes it.

Having determined that the policies in question would exclude an alter ego of Omega as a covered employee, we turn to the issue of whether the respondents' motions for summary judgment alleged undisputed facts, which established that Redd was, in fact, the alter ego of Omega such that he was excluded from coverage, entitling the respondents to summary judgment on that basis.

In support of summary judgment, based on its claim that Redd was the alter ego of Omega such that EACH, as its assignee, could not recover under the bond policies issued by the respondents for Redd's alleged thefts from Omega in its management of Sycamore Groves, the respondents alleged simply that: "At all relevant times, Tucson Redd was the President, Managing Officer, Director and sole Shareholder of Omega Realty Company, Inc." In claiming that these facts alone caused Redd to be the alter ego of Omega, the respondents cited several decisions of foreign jurisdictions which they contend stand for that proposition. There is some question in our

minds as to whether those decisions actually stand for the proposition cited. However, in any event, given the fact that the alter ego defense is predicated on the alter ego rule, the test to be applied would be the test of the alter ego rule enunciated by the appellate courts of this state, rather than by the courts of other jurisdictions. Applying the Missouri standard, we find that the respondents' allegations of Redd's control of Omega in their motion were insufficient to make a *prima facie* case for summary judgment on the basis of the alter ego defense.

As we noted, *supra*, under the alter ego rule adopted in this state, the corporate form will be disregarded only "when a corporation is so dominated by a person as to be a mere instrument of that person and is indistinct from the person controlling it." *Saidawi*, 987 S.W.2d at 504–05. The control necessary to invoke the rule is "not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." *66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32, 40 (Mo. *banc* 1999); *see also Thomas Berkeley Consulting Eng. v. Zerman*, 911 S.W.2d 692, 695 (Mo.App.1995). Thus, the fact that Redd was the sole shareholder of Omega in and of itself was not sufficient to invoke the alter ego rule. And, the fact that in addition he was the managing officer and a director of Omega does not conclusively establish that he completely dominated Omega's finances, policies and business practices with respect to its management of Sycamore Groves such that Omega at the time of the thefts had no separate mind, will or existence of its own. As EACH points out, the respondents never

alleged in their motion that Redd was the sole director of Omega or that Omega's board had ceased to function with respect to Omega's management of Sycamore Groves at the time of Redd's thefts. As EACH argues in its brief, under Missouri law, the "property and business of a corporation shall be controlled and managed by a board of directors." § 351.310. Thus, without specific factual allegations in the respondents' motion as to Omega's board of directors and its actions with respect to Sycamore Groves, we fail to see how the trial court could have found that Redd was not subject to the control and direction of Omega's board to the extent that Omega had no separate mind, will or existence of its own in its management of Sycamore Groves simply on the basis that Redd was the managing officer, a board member and sole shareholder of Omega. Hence, the trial court's summary judgment on that basis was improper.

Our determination that the trial court erred in granting summary judgment for the respondents on the basis of the alter ego defense does not end our inquiry. That is so in that even if the basis for granting summary judgment is improper, we are to affirm the trial court's grant of summary judgment if it could have been based on any theory raised in the motion and supported by the summary judgment record. *Lumbermens Mut. Cas. Co. v. Thornton*, 92 S.W.3d 259, 269 (Mo.App. 2002). In that regard, the respondents not only sought summary judgment on the basis that Redd was not a covered employee, but on several other bases as well. Thus, we now turn our attention to whether summary judgment for the respondents would have been proper on any one of the alternative bases asserted by the respondents in their motion.

In their motion for summary judgment, the respondents claimed, *inter alia*,

that EACH could not show, as required, that Omega had suffered a covered loss under the fidelity bond policies purchased from the respondents so as to allow EACH to recover under the policies as Omega's assignee in that the policies were only intended to indemnify Omega for any losses it occasioned due to the dishonesty of its employees and not to indemnify Omega for its liability to third parties, such as EACH, for such acts. In support of their argument, the respondents pointed in their suggestions to the policy language defining "covered property" as property "that you [Omega] own or hold, or (b) for which you are legally liable. However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization." The respondents cited several decisions of foreign jurisdictions in support of their interpretation of the Omega policies with respect to the issue of a covered loss.

As to their contention that EACH could never show, as required, that Omega had suffered a covered loss under the policies in that the monies misappropriated by Redd were used to benefit Omega, the respondents argued in their suggestions in support of their motion:

> Omega has not suffered a *loss* of property, either that it owned or held or for which it was legally liable. The undisputed facts show that Omega, through its alter ego, Tucson Redd, misappropriated funds were used by Omega to pay its own tax liabilities to the IRS. In effect, Omega robbed Peter to pay Paul, but suffered no loss itself.

Even assuming that the expenditure by Redd of the misappropriated funds in payment of the tax liabilities of Omega would not be considered a covered loss under the policies, to be entitled to full summary judgment on that basis, the respondents would have had to allege facts demonstrating that all the monies alleged as a loss by EACH were, in fact, expended on Omega's benefit. In that regard, the respondents alleged in their motion as an undisputed fact that: "The purpose of the withdrawals of the [misappropriated] funds [by Redd] as described in paragraph 26 above [totaling $55,526.50] was to pay tax obligations of Omega *and* Tucson Redd to the Internal Revenue Service." And, in their suggestions, they argued that "*most* of the misappropriated funds were used by Omega to pay its tax liabilities to the IRS." (Emphasis added.) As alleged, the respondents' facts are susceptible to the reasonable inference that the monies misappropriated by Redd were used to not only benefit Omega, but Redd himself. Thus, the facts alleged do not support the proposition that all of Redd's thefts benefited Omega, unless Redd were found to be the alter ego of Omega, which, as we discussed, *supra,* is an open question. Given this deficiency, it would have been error for the trial court to grant the respondents full summary judgment on the basis that the thefts of Redd benefited Omega such that they were not covered losses under the policies.

■ As a further alternative basis for summary judgment, the respondents alleged in their motion that EACH could not show coverage under the policies for Redd's thefts because, by the terms of the policies, coverage had been cancelled prior to the thefts. In support of this basis for summary judgment, they relied on the policy language providing that coverage was cancelled as to any employee: "Immediately upon discovery by (1) *You* [the insured]; or (2) Any of *your* [the insured's] partners, officers or directors not in collusion with the '*employee*' whether before or after becoming employed by *you* [the insured]; of any dishonest act committed by that '*employee*' whether before or after becoming employed by *you* [the insured]."

In their motion and brief, the respondents concede that this basis for summary judgment is predicated on "Omega [being] equated with the actions of Redd." Having already determined, *supra*, that the question of whether Redd and Omega are one in the same is an open question, then it follows that full summary judgment for the respondents would not have been proper on the basis that the policies had been cancelled at the time of the alleged employee thefts due to Omega's discovery of Redd's dishonest acts.

The respondents also claimed as a basis for summary judgment that EACH could not show that Omega had properly performed under the board policies to be entitled to recover thereunder. In that regard, they alleged that under the general conditions of the policies, specifically, "Duties in the Event of Loss," Omega, after discovering its claimed loss, was required, but failed, to: "a. Notify us [respondents] as soon as possible. b. Submit to examination under oath at our request and give us a signed statement of your answers. C. Give us a detailed, sworn proof of loss within 120 days. D. Cooperate with us in the investigation and settlement of any claim." Specifically, they claim that it was undisputed that Omega failed to submit a notice of probable loss or a proof of loss in a timely fashion and that neither Omega or EACH cooperated in the investigation of the claim, including assisting the respondents in obtaining Redd's deposition. In that regard, they alleged the following facts in their motion:

19. No proof of loss under the concerned policies was ever given by Omega or any of its officers, directors, agents or employees to [the respondents].

. . .

22. On or about January 6, 1999, [the appellant] submitted its Proof of Loss to Old Republic Surety Company, claiming that on April 17, 1998, it discovered a loss under the Old Republic policy of $69,466.50. A copy of the Proof of Loss is attached hereto as Exhibit 12.

23. On or about May 6, 1999, [the appellant] submitted its Proof of Loss to Reliance Insurance Company, claiming that on April 17, 1998, it had discovered a loss under the Reliance policy of $81,466.50. A copy of the Proof of Loss is attached hereto as Exhibit 13.

. . .

35. After the Proofs of Loss were filed by [the appellant] with [the respondents], both companies requested an examination under oath of Tucson Redd, the sole shareholder and managing officer of Omega.

36. Tucson Redd, Omega's sole shareholder and managing officer, failed and refused to appear for examination. When subpoenaed in this action, Tucson Redd refused to answer any questions concerning the claims set out · in the Proofs of Loss, claiming privilege against self-incrimination.

37. Omega failed and refused to produce the documentation requested by [the respondents] as part of its investigation.

Conditions of an insurance policy which require that the insured give notice of a loss to the insurer within a certain time are valid and enforceable. *Johnston v. Sweany*, 68 S.W.3d 398, 401 (Mo. *banc* 2002). However, the insured will not be barred from recovering under a policy based on the breach of such a condition, unless the insurer can demonstrate that it has been prejudiced by such breach. *Id.* at 402. We see nothing in the facts alleged in the respondents' motion for summary judgment that would establish prejudice to the respondents from the alleged breach of the insured's duties to notify the

respondents of its claimed loss and cooperate in the investigation of the claim such that full summary judgment would have been proper on that basis. *See Weaver v. State Farm Mut. Auto. Ins. Co.*, 936 S.W.2d 818, 821 (Mo. *banc* 1997).

■ The respondents also alleged that Omega and EACH breached the policy by failing to promptly produce Redd for examination under oath. It is undisputed that although he failed to appear for his initial deposition, he did eventually after being subpoenaed; although, he refused to answer any questions concerning the alleged thefts. Although EACH concedes that Redd did not appear for examination until subpoenaed, it contends that his failure to initially appear was caused by the respondents' hiring a law firm to represent them which had previously represented Redd to serve as their counsel in defending Omega's claim, resulting in a conflict of interest that was not resolved until after the respondents had requested to take Redd's deposition and suit was filed by EACH, such that even if the respondents alleged facts in their motion sufficient to establish a *prima facie* case for summary judgment on the basis of failing to produce Redd for deposition, a genuine dispute existed as to whether Redd's failure was excused by the respondents' own acts.

■ Finally, as to whether Omega and EACH failed to perform under the policies as a basis for summary judgment, the respondents contend that EACH cannot recover under the policies as Omega's assignee for failure to cooperate in the investigation due to Redd's claiming the Fifth Amendment and refusing to answer respondents' deposition questions. We have no quarrel with the fact that an insured's refusal to answer questions under oath as to the underlying material facts of the claim can bar recovery. *See Pervis v. State Farm Fire & Cas. Co.*, 901 F.2d 944,

947 (11th Cir.1990); *Kisting v. Westchester Fire Ins. Co.*, 290 F.Supp. 141, 147 (W.D.Wis.1968); *Halcome v. Cincinnati Ins. Co.*, 254 Ga. 742, 334 S.E.2d 155, 157 (1985). However, Redd was not the insured, unless he is said to be its alter ego, which, as we discussed, *supra*, is still in dispute. Thus, this contention of respondent could not form a basis for summary judgment for the respondents.

■ Having determined, for the reasons stated, that on the summary judgment record made, full summary judgment for the respondents was not proper on any basis alleged by the respondents, we must reverse the trial court's summary judgment for the respondents. As to EACH's remaining points, Points II–V, in which it claims on various grounds that the trial court erred in overruling its motion for summary judgment, we do not review in that "[a]bsent special circumstances, we do not review the denial of a motion for summary judgment." *In re Estate of Corbin*, 66 S.W.3d 84, 94 (Mo.App.2001) (*citing Calarosa v. Stowell*, 32 S.W.3d 138, 144 (Mo.App.2000)). EACH does not assert any special circumstances and none are readily apparent that would justify our review.

### Conclusion

The circuit court's summary judgment for the respondents on EACH's petitions for payment on the fidelity bonds issued by the respondents to Omega is reversed, and the case is remanded for further proceedings consistent with this opinion.

BRECKENRIDGE and SMART, JJ., concur.